UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                                                         :

**TRITON PACIFIC SECURITIES, LLC,**      :

                                                          :

        *Plaintiff and Counterclaim Defendant*    :

     - v-                                               :      Case No. 1:19-cv-05789

                                                          :

**MISSION CRITICAL SERVICES CORP.,**     :

                                                          :

        *Defendant and Counterclaim Plaintiff*    :

     - v-                                               :

                                                          :

**TRITON PACIFIC ADVISER, LLC,**
**TRITON PACIFIC INVESTMENT**
**CORPORATION, INC.,**
**TRITON PACIFIC CAPITAL PARTNERS, LLC,**
**TRITON PACIFIC CAPITAL GROUP, LLC,**
**CRAIG J. FAGGEN, MICHAEL L. CARROLL,**
**BRIAN D. BUEHLER AND WENDY F. POOLE,**

        *Counterclaim Defendants*        :
-------------------------------------------------------------------x

## <u>DEFENDANT'S ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS</u>

## <u>ANSWER</u>

    Mission Critical Services Corp. ("MCS" or "Defendant") by its attorney, Kevin D. Galbraith, Esq., answers the Complaint of Plaintiff Triton Pacific Securities, LLC ("Triton" or "Plaintiff") as follows:

    1.    Denies the allegations in paragraph 1, except admits that Triton was at various times a registered broker-dealer.

    2.    Denies the allegations in paragraph 2, except admits that Triton and MCS are citizens of different states.

    3.    Denies the allegations in paragraph 3, except admits that venue is proper in this District.

4.     Denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 4.

5.     Admits the allegations in paragraph 5.

6.     Denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 6.

7.     Denies the allegations of paragraphs 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, and 17, except admits that MCS has maintained a website and refers to that website for an accurate statement of its contents.

8.     Denies the allegations in paragraphs 18 and 19, except admits that from time to time MCS has modified the content of its website and refers to that website for an accurate statement of its contents at any particular time.

9.     Admits the allegations in paragraph 20.

10.     Denies the allegations in paragraph 21 and 22, except admits that Triton and MCS entered into a contract (the "Contract" or "Agreement") and refers to the Contract for an accurate statement of its contents.

11.     Denies the allegations in paragraph 23, except admits that the Contract remained in effect from December 20, 2013, until a date in May 2017, when Triton purported to terminate the Contract.

12.     Denies the allegations in paragraphs 24, 25, 26, and 27.

13.     Denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations in paragraphs 28 and 29.

14.     Denies the allegations in paragraphs 30, 31, and 32.

15.     Denies the allegations in paragraph 33, except admits that at certain times Triton designated and retained Jeffrey Barton ("Barton") and Monica DiFiore ("DiFiore"), respectively, to serve as Chief Compliance Officer ("CCO") of Triton.

16.     Denies the allegations in paragraphs 34, 35, 36, 37, 38, 39, 40, and 41.

17.     Denies the allegations in paragraphs 42 and 43, except admits that the National Association of Securities Dealers ("NASD") has issued a Rule 1021(a) and refers to that rule for an accurate statement of its contents.

18.     Denies the allegations in paragraph 44 and 45.

19.     Denies the allegations in paragraph 46, except admits that at certain times Brian D. Buehler ("Buehler") was an employee of Triton.

20.     Denies the allegations in paragraphs 47, 48, 49, 50, and 51.

21.     Denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 52.

22.     Denies the allegations in paragraph 53, except admits that DiFiore advised Triton that Buehler should obtain a Series 24 securities license in order to serve as a securities principal of Triton.

23.     Denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 54.

24.     Denies the allegations in paragraphs 55 and 56.

25.     Denies the allegations in paragraph 57, except admits that in May 2017 Triton purported to terminate the Contract.

26.     Denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations in paragraphs 58, 59, 60, and 61.

27.     Denies the allegations in paragraph 62 and 63.

28.     Denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 64.

29.     For its answer to the allegations in paragraph 65, MCS repeats and restates its responses to the allegations in paragraphs 1 through 64.

30.     Admits the allegations in paragraph 66.

31.     Denies the allegations in paragraphs 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, and 78.

32.     Denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 79.

33.     Denies the allegations in paragraphs 80, 81, 82, and 83.

34.     For its answer to the allegations in paragraph 84, MCS repeats and restates its responses to the allegations in paragraphs 1 through 83.

35.     Denies the allegations in paragraphs 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, and 100.

36.     Denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 101.

37.     Denies the allegations in paragraphs 102, 103, 104, 105, 106, 107, and 108.

38.     For its answer to the allegations in paragraph 109, MCS repeats and restates its responses to the allegations in paragraphs 1 through 108.

39.     Denies the allegations in paragraphs 110, 111, 112, 113, and 114.

40.     For its answer to the allegations in paragraph 115, MCS repeats and restates its responses to the allegations in paragraphs 1 through 114.

41.     Denies the allegations in paragraphs 116, 117, 118, and 119.

42.     Denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations in paragraphs 120 and 121.

43.     Denies the allegations in paragraphs 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, and 135.

44.     Denies the allegations in the Prayer for Relief.

## AFFIRMATIVE DEFENSES
### I: Failure to State a Claim

45.     MCS asserts the defenses set forth below. By designating these defenses as being Affirmative Defenses, MCS does not take on any evidentiary burdens of proof or persuasion that are not otherwise imposed on MCS as a matter of law.

46.     The Complaint fails to set forth a claim upon which relief can be granted. The legal defects in the Complaint include, without being limited to, these:  (a) the Complaint has alleged no breach of any covenant or representation that actually is contained in the parties' Contract, (b) neither under the parties' Contract, nor as a matter of governing law, rules and regulations, was MCS a fiduciary to Triton (and Triton has no good faith basis to claim otherwise), (c) MCS earned all amounts paid to it by its performance over a three-plus year period in providing valuable services to Triton and its affiliates, (d) in contrast, Triton materially failed to perform its obligations and materially breached its representations in the parties' Contract, and (e) MCS made no representations to Triton of any type other than those that were specifically included in the Contract, and Triton has not properly alleged MCS breached any representation in the Contract, and the Agreement excludes any representations outside of the Agreement.

47.     Furthermore, all the actions and/or inactions on which the Complaint is based were the actions and/or inactions of Triton's own executive officers, associated persons and employees, not of MCS.

48.     Triton has failed to describe or show any damages that were directly or proximately caused by MCS' conduct.

49.     Triton's Complaint is based upon an Acceptance, Waiver and Consent ("AWC") with FINRA by Triton, which Triton solely determined to enter into of its own volition. By entering into the AWC, neither FINRA nor any other regulatory agency concluded that Triton violated any applicable law, rule or regulation. Triton itself acknowledged that it violated certain FINRA rules.

50.     The actions and/or inactions of the CCOs alleged in the Complaint were the actions or inactions of Triton's duly-designated CCOs, who were associated persons of Triton, and not of MCS.

51.     Triton's damages were the direct result of its own negligence or malfeasance by failing to require Buehler, an associated person and registered representative of Triton, to take and pass the Series 24 examination prior to directing him to engage in principal activities, which principal activities were concealed from MCS and the CCOs.

52.     During the 2017 FINRA examination leading to the FINRA enforcement action that resulted in Triton entering into the AWC, a FINRA examiner did not initially find that Buehler was acting as a principal. It was only near the conclusion of the examination that the FINRA examiner inquired about Buehler's email signature block, which stated Buehler was Triton's President. In effect, the FINRA examiner then directed Buehler to change the signature block. When Triton, through its Chief Financial Officer ("CFO") and Financial and Operations

Principal ("FINOP") Michael L. Carroll ("Carroll"), asserted Buehler was President without any explanation regarding Buehler's role and responsibilities, the examiner conducted further examination, which led to the findings concerning Buehler's involvement and unauthorized activities with making employment and bonus decisions. The FINRA examiner asked for a supervisory chart, which Triton provided, but the chart did not disclose that Buehler was acting in any supervisory or principal capacity. It is clear that Triton intentionally sought to conceal Buehler's principal activities from FINRA, the CCOs and MCS.

## II: The CCOs Informed Triton that Buehler Would Need a Series 24 to Function as Principal

53.     The Complaint alleges in multiple instances that the CCOs did not inform Triton that Buehler would need a Series 24. Paragraph 49 of the Complaint alleges that Triton first became aware that Buehler would need the Series 24 when FINRA informed it of such in connection with its 2017 examination of Triton.  This is false.

54.     However, Barton, CCO at the time, informed Triton and Carroll and Craig A. Faggen, Triton's President and principal owner ("Faggen"), that Buehler would need a Series 24 on July 1, 2015.

55.     The Complaint conveniently ignores the fact that a Series 24 window was actually opened for Buehler on what MCS believes was the very first day Buehler started employment with Triton, July 20, 2015. This is an indisputable fact and Triton has no good faith basis to claim otherwise.

56.     This window, which, on information and belief, was opened by a person with CRD access at Triton was opened based on the guidance of Barton, and would permit Buehler, assuming he sat for and passed the examination, to assume the role and responsibilities intended for him at Triton as disclosed in the press release announcing his hire.

7

57.    According to Triton's general ledger, Triton purchased the Series 24: Koopman Marks Training manual for Buehler's use on October 21, 2015. This demonstrates that Triton knew that Buehler needed the Series 24 license.

58.    Upon expiration of that initial Series 24 examination window without Buehler having passed the Series 24 examination, Barton opened a new Series 24 window for Buehler on December 9, 2015. This is also an indisputable fact and Triton has no good faith basis to claim otherwise.

59.    Buehler was either unable to pass the examination in two attempts or he avoided taking it during the many months these two windows were open.

60.    DiFiore became CCO in March 2016. Triton represented to her that Buehler was not engaging in any supervisory activities.

61.    In April 2016, at the request of Triton, DiFiore prepared and sent a letter to Arque Capital, Ltd. that stated:

> "Per your request, Brian Buehler is the appointed President of Triton Pacific Securities. <u>Brian does not currently engage in any supervisory responsibilities</u>, this is managed by Craig Faggen, CEO."

62.    This letter states (i) that Buehler was not engaging in supervisory responsibilities and (ii) that Faggen was carrying out all supervisory responsibilities, because all relevant parties at Triton -- Faggen, Buehler, Carroll, Wendy Poole ("Poole") and Triton itself -- knew that Buehler had not obtained the necessary Series 24 qualification and thus was not permitted to engage in principal activities.

63.    The individuals whom Triton designated  and retained to act as CCO (i) told Triton and Triton's relevant officers and employees that Buehler needed to acquire the Series 24 license, (ii) tried to cause Buehler to take the Series 24 examination so he could assume the role

and responsibilities as President of Triton and be named as such on its Form BD and (iii) on the

representation of Triton that Buehler was not engaging in principal activities, assisted Triton in

preparing various regulatory filings and other documents that indicated that Buehler was not a

principal and that Faggen continued as Triton's President. The representations that Triton made

concerning Buehler's and Faggen's roles and responsibilities at Triton and the efforts that the

CCOs made to ensure that Buehler was properly licensed include these:

- July 1, 2015: Triton's SEC Form BD disclosed Faggen as its president.
- The same day, Barton told Faggen and Carroll that a Series 24 was necessary for Buehler to function as a supervisory principal of Triton.
- July 20, 2015: Buehler joined Triton. His initial Form U4 was filed to register him with Triton.
- September 3, 2015: A Form U4 was filed for Faggen. It disclosed him as Triton's president. It was signed by Faggen.
- On or before September 15, 2015, Triton attempted to amend its SEC Form BD for various reasons, including to disclose Buehler as President, but as Buehler did not have a Series 24, this SEC Form BD amendment continued to disclose Faggen as President. It was signed by Faggen.
- Marketing materials in use by Triton in October 2015 referred to Buehler as "Partner" only, not President. On information and belief, Buehler was never a partner of Triton.
- October 21, 2015: Triton pays for "Series 24: Koopman Marks Training" for Buehler.
- December 9, 2015: Barton opened a new Series 24 window; this window expired on or about April 9, 2016.
- January 25, 2016: A FINRA contact system verification filing generated by Barton made no reference to Buehler holding any position at Triton.
- February 2016: DiFiore completed an AML audit report shortly before becoming CCO. The report disclosed Faggen as CEO and President. Carroll and Poole at Triton reviewed the report, were specifically asked by DiFiore if the report was accurate, and both Carroll and Poole informed DiFiore the report did not contain any errors.
- In March 2016, DiFiore was designated as CCO by Triton; Triton's SEC Form BD, which continued to disclose Faggen as President, was amended to disclose DiFiore as CCO.
- May 26, 2016: The SEC transmits a document request letter to Triton and its affiliated registered entities in which Faggen is addressed in the letter as "President of Triton Pacific Securities, LLC." We believe this letter to be telling as it, and other documents provided to the SEC, demonstrate that even the SEC knew Faggen to be President.

- In August 2016, Triton determined to amend its SEC Form BD to list Buehler as President and Faggen as CEO; but as Buehler did not have a Series 24; this SEC Form BD amendment was made only to disclose Faggen as CEO.
- November 22, 2016: A U4 amendment is filed for Faggen. It disclosed him as President of Triton. It was signed by Faggen.
- December 6, 2016: Triton adopts a new supervisory manual. Its supervisory matrix does not list Buehler in any executive or supervisory capacity, e.g., as the head of any department.
- In December 2016, Buehler asked DiFiore to send him reminders to take the Series 24, which DiFiore did, including on February 9, 2017.
- During DiFiore's tenure, Triton made regulatory filings in which it stated that Faggen was the branch manager of Triton's Laguna Nigel branch office, even though Buehler worked in that branch office.
- February 2017: A Form U4 amendment is filed for Faggen to update his outside business activities. It disclosed him as President of Triton. It was signed by him..
- February 8, 2017: An amended SEC Form BR (branch office report) was filed to update the Laguna Nigel branch office address at which Buehler worked. This Form BR stated that Faggen is the branch supervisor. If Buehler was a principal, he would have been the supervisor of his own branch.
- February 9, 2017: DiFiore sends an email to Buehler, in which she writes: "P.S. Don't forget to study!!!"
- February 14, 2017: A branch inspection for the Laguna Nigel office (Buehler's branch office) is signed by Faggen, and he attests that he is the supervisor/branch manager of the office and that Buehler has no supervisory position whatsoever.
- March 24, 2017: Triton amends its SEC Form BD. Faggen is disclosed as CEO. Buehler is not listed.
- In May 2017, FINRA conducted an examination of Triton, and Triton's Form BD disclosed Faggen as CEO and Buehler was not disclosed in any executive officer capacity.
- May 12, 2017: The FINRA examiner questioned Buehler's use of the title of President.
- May 15, 2017: Carroll advised FINRA that Buehler was the President. This resulted in FINRA investigating Triton and Buehler's activities that led to the FINRA enforcement action.
- May 23, 2017: Carroll emails MCS: "Per our discussion, attached is the formal notice for termination of contracted services. Thank you for the assistance over the past few years. We will keep MC in mind for future consultative needs as they arise."
- December 8, 2017. Triton signs the AWC. Principal activity by Buehler disclosed therein includes being involved in decisions regarding the employment status of other registered representatives and being involved in the distribution of sales bonuses to two registered representatives.

64.    The steps the CCOs took to cause Buehler to be properly licensed included

informing Triton and Buehler of the Series 24 requirement, opening Series 24 windows for

Buehler to take the examination, asking Buehler to take the examination, and even reminding
Buehler to study for the examination, which DiFiore did in an email that stated: "P.S. Don't
forget to study." Nevertheless, Triton and Buehler declined to follow the CCOs' advice.

65.    The evidence will demonstrate that Triton's failures that resulted in the AWC
were caused by the negligence, malfeasance and fraud of Triton, Faggen, Buehler, Carroll and
Poole.

### III: Triton – not MCS -- Selected and Designated the CCOs

66.    The Complaint alleges in multiple instances that MCS provided Triton with the
CCOs.

67.    All allegations in the Complaint regarding Barton becoming CCO are false.

68.    Triton asked MCS if Triton could hire Barton as CCO. Triton made that request
because Faggen, who had been Triton's CCO since inception, wished to reduce his compliance
responsibilities, and Carroll was aware of Barton's credentials and skills from having worked
with him for eleven months.

69.    Barton, an attorney, was interviewed by Carroll, and after Carroll became
satisfied with Barton's credentials and skills in broker-dealer compliance matters and his
securities licenses, Triton selected Barton to be its CCO.

70.    Barton was then designated as CCO by Triton.

71.    Triton designated Barton pursuant to federal securities laws, rules and regulations
and FINRA rules.

72.    MCS had no legal or regulatory standing to provide, appoint or otherwise
designate Barton as being CCO for Triton.

73.    MCS did not provide, appoint or otherwise designate Barton as CCO for Triton.

74.     FINRA Rule 3130 makes clear that it is a member of FINRA – and not a third-party service provider – who must designate the CCO for the FINRA member:

> "Each member shall designate and specifically identify to FINRA on Schedule A of Form BD one or more principals to serve as a chief compliance officer."

75.     Triton's apparent disavowal of its own responsibility over designating CCOs evidences its own compliance shortfalls and understanding of its responsibilities as a Securities and Exchange Commission ("SEC") registered broker-dealer and FINRA member.

76.     After Barton left as CCO, Triton followed essentially the same process in interviewing, selecting and then designating DiFiore as CCO.

77.     MCS did not provide, appoint or otherwise designate DiFiore as CCO for Triton.

### IV: The CCOs were not Officers of Triton

78.     The Complaint alleges that the CCOs were "corporate officers" of Triton and as a result had state law fiduciary duties to Triton.

79.     Triton is not a corporation and therefore has no "corporate officers".

80.     No CCO was an officer of Triton within the meaning of the Delaware Limited Liability Company Act or Triton's own limited liability company agreement.

81.     The CCOs were outsourced independent contractors using the "Chief Compliance Officer" title mandated by federal securities laws, rules, regulations and FINRA rules.

82.     The CCO's were not compensated by Triton.

83.     Triton never took any step required under its limited liability company agreement and state law such that either CCO would be an officer.

84.     There is no merit to Triton's allegations that third-party independent contractors, retained pursuant to FINRA rule, who were not compensated by Triton, were not appointed

under state law as officers of Triton, and who had no physical presence at Triton, assumed fiduciary duties to Triton.

85.     NASD Notice to Members 05-48 includes the following regarding outsourced service providers, such as the CCOs:

> "NASD is aware that members are increasingly contracting with third-party service providers to perform certain activities and functions related to their business operations and regulatory responsibilities that members would otherwise perform themselves—a practice commonly referred to as outsourcing. NASD is issuing this Notice to remind members that, in general, any parties conducting activities or functions that require registration under NASD rules will be considered associated persons of the member, absent the service provider separately being registered as a broker-dealer and such arrangements being contemplated by NASD rules (such as in the case of clearing arrangements), MSRB rules, or applicable federal securities laws or regulations. In addition, outsourcing an activity or function to a third party *does not relieve members of their ultimate responsibility for compliance with all applicable federal securities laws and regulations and NASD and MSRB rules* regarding the outsourced activity or function." [Emphasis added]

## V: MCS Owed No Fiduciary Duties To Triton

86.     The Complaint alleges that MCS owed fiduciary duties to Triton.

87.     Triton and MCS are business entities that have each been in business for years.

88.     Such parties entered into the Contract, which sets forth the rights and obligations of each party.

89.     Nothing in the Contract creates or imposes on MCS a fiduciary duty to Triton. In fact, the Contract states in Section 5.i:

> "No Agency Relationship Implied. Parties will each perform the obligations contemplated hereunder solely as independent contractors, and no joint venture, partnership, employment, agency or any other relationship is intended, accomplished or embodied in this Agreement."

90.      The Contract states that MCS is entitled to rely on the information that Triton provides, and the representations that Triton makes, to MCS, and MCS owes no duty to Triton to verify that information or the accuracy of those representations.

13

91.     The Contract further states that Triton is responsible for its own compliance program, and MCS is not.

92.     Section 3 of the Contract states:

"To the extent required by applicable laws rules, and regulations promulgated by, including, but not limited to, CFTC, FINRA, NASDAQ, NFA, SEC, Treasury (referred collectively as the "Rules"), Client (i) acknowledges to Mission Critical that it is *Client's responsibility to design, establish and maintain a system of internal accounting controls and compliance program in compliance with applicable Rules, (ii) acknowledges and agrees with Mission Critical that it is Client's responsibility to comply with required applicable Rules."* [Emphasis added]

93.     This is further evidence that MCS owed no fiduciary duty to Triton.

## VI: MCS Made None of the Promises or Representations Alleged by Triton

94.     Triton alleges that MCS made various promises and representations to Triton, including through certain content on MCS' website.

95.     Paragraph 22 of the Complaint alleges that Triton entered the Contract based on MCS' representations that it was (i) able to provide a competent CCO and (ii) to perform all the services described on MCS' 2018 website.

96.     Paragraphs 44 and 45 of the Compliant allege that MCS made assurances that Triton's personnel serving as principals would be properly registered.

97.     The Contract sets forth the full terms and conditions of the parties' contractual relationship and none of the alleged promises or representations found in Triton's Complaint are in the Contract.

98.     The Contract contains an integration clause, which states that it is the entire agreement between the parties and that it supersedes all other communications of any kind and nature between the parties. Therefore, Triton's allegations regarding MCS' supposed promises and representations are irrelevant. Section 5.i. of the Contract states:

"This Agreement sets forth the *entire* agreement and understanding between the Parties as to the subject matter hereof and merges and supersedes *all* prior discussions, agreements, understandings, negotiations, correspondences, undertakings and communications (whether written, oral or electronic) of any kind and every nature between them."  [Emphasis added.]

99.     The Contract was entered into at least eleven months before Triton approached MCS regarding Triton hiring Barton as CCO.  The Contract is silent, i.e., there is no language at all regarding a CCO. Thus, Triton's allegations that it entered the Contract as a result of MCS' representations to provide a competent CCO are false.

100.    Triton alleges (i) that certain content from the website of MCS as of July 2018 constituted promises and representations to Triton, (ii) that Triton relied on such content in entering the Contract and (iii) MCS induced such reliance.

101.    The website content referred to in the Complaint are simply services that the MCS may provide. MCS does not provide "twenty-five types of services" to every broker dealer client as the services listed on the website are merely services that MCS is willing and able to provide, subject to the needs and wants of its clients.  Further, such marketing content assumes, among other things, that MCS' clients will not systematically seek to avoid their registration obligations as Triton and its personnel did here, which is disclosed publicly in the AWC.

102.    The website content on which Triton purportedly relied was created more than one year after the Contract was terminated.

103.    In fact, in December 2013, when Triton was deciding whether to enter into the Contract, MCS's website contained none of the content that Triton copied into the Complaint and on which Triton claims to have relied in 2013 and Triton has no good faith basis to claim otherwise.

104.    The Complaint alleges that Triton relied on <u>non-existent website content</u> when it determined to enter the Contract.

105.    The Complaint alleges that MCS induced Triton's reliance as a result of non-existent website content.

106.    There is no basis for any claim by Triton that it relied on any promises, representations or inducements other than those that are specifically set forth in the Contract and Triton has no good faith basis to claim otherwise.

### VII: The Contract Does not State that MCS Will Pay Triton's Costs

107.    The Complaint requests that Triton recover costs and expenses of this action.

108.    The Contract includes no obligation of MCS to pay any of Triton's costs, fees or expenses.

### VIII: MCS Had No Authority

109.    The Complaint alleges that MCS permitted a registered representative of Triton to function as a principal of Triton without proper qualifications.

110.    However, MCS had no legal or regulatory standing to permit, or for that matter deny, a Triton employee registered with Triton as a general securities representative to function as a principal of Triton.

### IX: The CCOs Were Competent

111.    The Complaint alleges that the CCOs were incompetent.

112.    In fact, the CCOs were competent as, among other things, each had passed FINRA's competency examination to serve as a principal.

113.    Barton is an attorney who has a juris doctorate from Pepperdine Law School.

114.    Barton holds the following FINRA series licenses: 7, 24, 26, 61 and 68.

115.   At the time he served as CCO, Barton had more than ten-years' experience in compliance matters in the securities industry.

116.   DiFiore holds the following FINRA series licenses: 4, 7, 24, 57, 63, 79 and 99.

117.   At the time she served as CCO, DiFiore had more than seven-years' experience in compliance matters in the securities industry.

118.   Multiple times, the CCOs prevented Triton from amending its Form BD to disclose Buehler as President, which would have been a material violation of the federal securities laws, rules and regulations and FINRA rules.

119.   It is clear that each of Barton and DiFiore acted competently at all times in performing their respective CCO duties and that the unauthorized activities that led to the AWC were the result of Triton's, Faggen's. Carroll's and Buehler's own negligence, incompetence, misfeasance or fraud. Their misconduct and failings included (i) the failure of Buehler to take and pass the Series 24 between July 20, 2015 and May 2017 despite having had a window opened to take such examination no less than three times, including on the day he joined Triton; (ii) Faggen and Carroll permitting Buehler to function as a principal despite their own respective knowledge of relevant FINRA rules and (iii) Plaintiff, Faggen, Carroll, Buehler and Poole all concealing Buehler's unauthorized activities from the CCOs and regulators.

120.   The CCOs had no authority, implied or otherwise, to one-hundred percent ensure Triton's regulatory compliance.

### X: Performance of the Contract

121.   MCS fully performed under the Contract.

122.     MCS by provided compliance support services to Triton for more than three years and provided thousands of instances of advice, guidance, compliance testing and many other compliance support services.

123.     Triton did not terminate the Contract for the reasons alleged in the Compliant, but rather as Triton and its affiliates were in final negotiations with a new compliance consultant that had agreed to lower fees. Triton therefore terminated the Contract as a cost-saving measure. Further, during at least the last twelve months the Contract was in effect, Triton had criticized amounts billed by MCS. It had routinely sought to reduce this expense. Among other things, if MCS had been provided sufficient budget to conduct all the compliance services it wanted, it could have taken additional steps to provide guidance as to Buehler's activities. In addition, by criticizing the amount of time spent on compliance services, and in seeking to reduce compliance expense, Triton evidenced a disregard for compliance.

124.     On May 23, 2017, Carroll sent MCS an email indicating Triton was satisfied with services MCS had provided to it:

> "Per our discussion, attached is the formal notice for termination of contracted services. Thank you for the assistance over the past few years. We will keep MC in mind for future consultative needs as they arise. We have enjoyed working and growing with Mission Critical, and I personally thank you for your assistance over the past few years. We have enjoyed working and growing with Mission Critical, and I personally thank you for your assistance over the past few years."

125.     Paragraphs 44 and 45 allege that MCS provided assurances.

126.     Paragraph 75 of the Complaint alleges that MCS breached the Contract by failing to negotiate a resolution with FINRA. This allegation is false.

127.     Triton terminated the Contract before the issue of Buehler's unauthorized activities were referred to FINRA's Department of Enforcement, and MCS was unaware of the enforcement action.

128.    Triton made no effort to inform MCS of the enforcement action.

129.    Even if Triton had not terminated the Contract prior to the referral to FINRA's enforcement group, the Contract says nothing about MCS negotiating resolutions with regulators and Triton did not ask MCS for any help in connection with those negotiations.

## XI: Doctrine of Laches and Statute of Limitations

130.    Some or all of Triton's claims are barred by the doctrine of laches and/or by applicable statutes of limitations.

## XII: Statute of Frauds

131.    Some or all of Triton's claims are barred by the applicable statute of frauds.

## XIII: Estoppel / Unclean Hands / Contributory Negligence

132.    If Triton sustained the damages alleged in the Complaint, they were wholly caused by the culpable conduct of Triton and its affiliated entities, and their officers and employees, and MCS is entitled to judgment dismissing the Complaint herein, or in the alternative, MCS is entitled to judgment assessing and apportioning the culpable conduct of Triton and its affiliated entities, and their officers, associated persons and employees in contributing to the claimed damages.

133.    At all times relevant to this matter, Triton made multiple false filings under the federal securities laws, rules and regulations and FINRA rules.

134.    On or about September 3, 2015, less than three months after Buehler had purportedly been "designated President," an SEC Form U4 amendment was filed by Triton that stated that Faggen was Triton's President. It was signed by Faggen. As alleged in Triton's Complaint, Buehler was Triton's President making this filing false.

135.    Like all SEC regulatory filings, the SEC Form U4 was filed under penalties of perjury and, therefore, any misrepresentation was subject to criminal or other sanctions by law enforcement authorities.

136.    This SEC Form U4 filing fully refutes the allegation in the Complaint that Buehler was appointed President in July 2015.

137.    Also, on September 15, 2015, Triton filed an SEC Form BD amendment that reported that Faggen was its President.

138.    SEC Form BD itself includes a warning that all information disclosed on the form must be accurate and timely:

> "WARNING: Failure to keep this form current and to file accurate supplementary information on a timely basis, or the failure to keep accurate books and records or otherwise to comply with the provisions of law applying to the conduct of business as a broker dealer would violate the Federal securities laws and the laws of the jurisdictions and may result in disciplinary, administrative, injunctive or criminal action.
>
> INTENTIONAL MISSTATEMENTS OR OMISSIONS OF FACTS MAY CONSTITUTE CRIMINAL VIOLATIONS."

139.    Triton now claims that Buehler was President at this time, yet its SEC Form BD reports Faggen was President, and Faggen signed this form.

140.    As such, Faggen and Triton appear to have violated the registration rules under the Securities Exchange Act of 1934, as amended, and FINRA rules.

141.    There have been multiple other false filings made by Faggen and Triton, including Faggen's SEC Form U4, which listed him as President in the period of time when Triton now claims that Buehler was President.

142.    Moreover, each of Faggen, Carroll and Buehler knew or should have known that Buehler could not engage in principal activity without a Series 24. They were each experienced and knowledgeable FINRA registered principals or registered representatives.

143.    Faggen in fact served as Triton's CCO for many years prior to Barton. Faggen has 21 years of experience in the securities industry and holds the following FINRA series licenses: 7, 24. 27 and 63. Carroll had 10 years' experience at the time Buehler became President. Yet, Carroll contributed to the Triton's violative conduct by permitting Buehler to make decisions regarding representative compensation and hiring and firing registered representatives. Buehler has had a 20-year career in the securities industry. He held the FINRA series licenses 7, 63 and 65 when he joined Triton. In order to pass the Series 7 exam, Buehler would have had to demonstrate in-depth knowledge of FINRA rules, including rules pertaining to securities principals, as well as the types of activities could not be done without the appropriate license.

144.    On information and belief, Triton hired Poole in 2016 to relieve Carroll from certain compliance-related responsibilities. Carroll had informed MCS he was "swamped" and "could not handle compliance." Poole, who touted her experience with registration and licensing, became the primary point of contact between the CCOs and Triton. Poole prepared and filed all or substantially all of Triton's regulatory filings.

145.    It was Triton's responsibility, not any CCO's or MCS' responsibility, to take steps to ensure that the named President satisfied all regulatory requirements before assuming his duties as President. Contrary to Plaintiff's allegations, it was Faggen, Buehler's direct supervisor and branch manager, who failed to supervise Buehler's activities

## XIV: Triton Breached the Contract

146.     Triton did not sustain the damages alleged in the Complaint, but if any damages were incurred, they were caused by Triton's own misconduct, including its breach of the Contract.

147.     Section 2.c. of the Contract provides that Triton shall "perform the tasks, furnish acceptable personnel, provide the resources and undertake the responsibilities set forth in this Agreement."

148.     Section 2.e. of the Contract provides that Triton is responsible for:

> "[E]stablishing and maintaining an adequate and effective internal control system, compliance program, record keeping, management, decision-making and other management and compliance functions. Client recognizes that Client shall be fully and solely responsible for applying independent business judgment with respect to services and work provided by Mission Critical, to make implementation decisions, if any, and to determine further courses of action with respect to any matters addressed in any advice, recommendation, services, reports or other work product or Deliverable provided by Mission Critical to Client."

149.     Section 3.c. of the Contract states that it was Triton's responsibility to comply with all "required applicable Rules."

150.     Triton did not perform the tasks it was responsible for. By not causing Buehler to acquire a Series 24 license, even though its CCOs informed Buehler and Triton that Buehler should obtain the Series license if he were to perform activities requiring such license. Triton failed to furnish acceptable personnel, it failed to undertake its responsibilities, and it failed to comply with all "required applicable Rules."

## XV: No Warranties

151.     Triton is not entitled to relief because Section 3.b. of the Contract provides that MCS makes no express or implied warranties.

152. Section 3.b.:

"Notwithstanding anything to the contrary contained in this Agreement, Mission Critical makes no warranties, express or implied, or whether arising by operation of law, course of performance or dealing, custom, usage in the trade or profession or otherwise, including without limitation, implied warranties [of] merchantability, noninfringement and fitness for a particular purpose."

## XVI: Failure to Mitigate

153. To the extent Triton has sustained damages, any and all damages -- which MCS expressly denies are the responsibility of MCS--Triton has failed to mitigate those damages.

## XVII: Good Faith and Reasonable Reliance

154. At all times relevant to this action, MCS acted reasonably and in good faith. The Contract provides an entitlement to rely on statements made by Triton, and the CCOs and MCS did reasonably rely on such statements. Triton never told MCS or Triton's CCOs that Buehler was engaging in principal activities and has no good faith basis to say otherwise. In fact, Triton told Triton's CCOs the opposite – that Buehler was not functioning as a securities principal.

155. Thus, Triton misrepresented critical facts to MCS and Triton's CCOs.

## XVIII: Knowledge by Triton

156. Triton knew the precise facts that it now claims not to have known.

157. Triton was made aware as early as July 1, 2015, that Buehler would need a Series 24 license in order to act as a principal and carry out supervisory responsibilities.

158. Triton and Buehler knew that he was not allowed to perform supervisory tasks without first having obtained the Series 24 license. The CCOs informed Triton and Buehler of this fact, the CCOs advised Triton and Buehler to take the examination, and the CCOs even opened the necessary windows to enable to Buehler to take the examination. In the face of clear guidance, Triton and Buehler still failed to take the steps needed to obtain the Series 24 license

for Buehler. This was gross negligence by Triton and Buehler, and if any harm resulted to Triton from its own actions and inactions, and/or from the actions or inactions of Buehler, that harm was caused solely by the gross negligence of Triton and Triton's officer, Buehler.

## XIX: Fraud by Triton

159.    A defense is founded upon fraud by Triton.

160.    The Contract provides an entitlement to rely on the accuracy of information provided by Triton.

161.    Having provided MCS and Triton's CCOs with false information regarding the activities of Buehler, including false regulatory filings and other documents that disclosed Faggen as President, Triton seeks damages that were sustained due to its own fraudulent conduct.

## XX: Breach of Contract and Release by Triton

162.    Section 5(c) of the Contract states that MCS is entitled to rely on the accuracy of all information that Triton provides to MCS. In fact, in Section 5(c) Triton releases MCS from all liability to the extent that the liability is "solely attributable to any information provided by" Triton that "is not complete, accurate or current in all material respects."

163.    The CCOs told Triton that before Buehler could perform supervisory responsibilities at Triton, Buehler would have to obtain the Series 24 license. Rather than follow the CCOs' advice, Triton provided the CCOs with the false information that only Faggen, and not Buehler, was carrying out supervisory responsibilities at Triton. By providing such false information to the CCOs, Triton violated the Contract, and such a violation defeats some or all of Triton's claims.

164.     By its Complaint, Triton seeks to impose liability on MCS, but that liability is solely attributable to the false information that Triton provided and thus Triton's claims are barred by the release in the Contract.

## XXI: No Damages

165.     Triton is not entitled to compensatory damages as Triton has suffered no demonstrable harm to its business. MCS has asked for proof of damages and none has been provided. Triton will need to provide evidence of such damages and any such evidence, if produced, will be scrutinized with a high degree of skepticism.

166.     Triton is not entitled to punitive damages because MCS at all times acted reasonably and in good faith.

## XXII: Inflated Damages

167.     This Court lacks jurisdiction over the subject matter of this action, because in an effort to reach the jurisdictional minimum amount of $75,000, Triton has grossly inflated its claim of damages.

168.     In connection with the AWC, Triton was ordered to pay a fine of $10,000. MCS did not cause Triton to incur that fine, and therefore MCS is not liable for those damages, but even if MCS somehow were responsible for the fine, those are the only damages that Triton genuinely has incurred. That is well below the minimum amount required for subject matter jurisdiction.

169.     All other claims of damages in the Complaint are fabrications with no substantive basis in actual harm incurred by Triton, which harm MCS asserts was entirely or predominantly the result of the negligence, misfeasance and fraud of Triton, Faggen, Buehler, Carroll and Poole.

## XXIII: Economic Loss Doctrine

170.     A defense is founded upon the economic loss doctrine in that, as Triton and MCS

are parties to the Contract, all claims other than breach of contract are not viable.

## XXIV: Injury or Damage not Cognizable at Law

171.     Triton's claims for damages are barred in whole or in part because the alleged

damage is not cognizable at law.

## XXV: No Reasonable Basis; Retaliation

172.     Triton has no reasonable basis for the allegations set forth in the Complaint and

has commenced this action as a retaliatory measure against MCS in an attempt to intimidate,

harass and to maliciously injure MCS.

## XXVI: The Claims Are Frivolous

173.     Some or all of Triton's claims are without a reasonable basis in law or fact, and

are subject to sanctions under Rule 11, Fed. R. Civ. P.

## XXVII: Triton did not pay the Contract Damages Alleged

174.     The Complaint alleges that Triton paid MCS $280,000.

175.     This is false as only a small portion of that amount was paid by Triton. The bulk

of the $280,000 was paid by Triton's affiliated regulated entities, which are not parties to this

action.

## XXVIII: Additional Affirmative Defenses

176.     MCS reserves the right to assert all additional defenses that may exist.

## COUNTERCLAIMS AND CLAIMS AGAINST OTHER PARTIES

For its counterclaims against Triton and its claims against TP Flexible Income Fund, Inc.

("TPFI") (fka Triton Pacific Investment Corporation), Triton Pacific Adviser, LLC ("TPA"),

Triton Pacific Group, Inc. ("TPG"), Triton Pacific Capital Partners LLC ("TPCC"), Faggen, Buehler, Carroll and Poole, MCS alleges, on personal knowledge as to its own actions and on information and belief as to the actions of others, as follows.

## Nature of the Claims

177.    Triton's Complaint is badly confused – about the Contract between Triton and MCS, about FINRA rules and the federal securities laws, rules and regulations (collectively, "Applicable Securities Laws"), about the conduct of Triton, Faggen, Buehler, Carroll, Poole and the CCOs, and about the role that Triton and Buehler each played in causing Triton's regulatory problems and any harm about which Triton now complains. Above all, Triton tries conveniently to ignore its own misconduct – in the form of violations of Applicable Securities Laws, breaches of the Contract, and Triton's making of false representations – that are causing severe harm to MCS. The purpose of these claims is to remedy the harm to MCS.

178.    MCS' claims rest on the parties' Contract and on settled Applicable Securities Laws and common law. Triton is an SEC registered broker dealer and a FINRA member. Applicable Securities Laws imposed on Triton a non-delegable duty to establish and maintain adequate internal controls and a compliance program, and to comply with Applicable Securities Laws. In the Contract, Triton expressly agreed to honor Applicable Securities Laws `and Triton acknowledged that compliance with the applicable rules was Triton's – and not MCS' – duty.

179.    Triton failed to maintain adequate internal controls, compliance mechanisms and a compliance program, and thus Triton breached its Contract with MCS. In fact, Triton deliberately flouted Applicable Securities Laws and the Contract by rejecting the advice of its CCOs. Thus, Triton's breach of the Contract was willful and material. Worse still, Triton made false statements to the SEC, FINRA, the investment community, and MCS about the respective

roles that Faggen and Buehler were playing at Triton. In the face of Triton's gross misconduct, FINRA's fine of $10,000 was miniscule, and Triton certainly has no basis on which to pass that fine on to MCS. To the contrary, Triton and the other defendants on MCS' claims should be held liable for the damages they have caused, and are causing, to MCS.

180.    In addition, in the Contract, Triton agreed not to disparage MCS in any way. In public statements that Triton made about MCS – outside of the Complaint in this action – Triton has made claims about MCS that are false, disparaging, and even defamatory. Those false, disparaging, and defamatory statements have caused harm to MCS, which MCS also seeks to remedy here.

### The Parties to the Counterclaims and Additional Claims

181.    MCS is a New York corporation with its principal office at 641 Lexington Avenue, 14th floor, New York, NY 10022.

182.    Triton is a licensed broker-dealer formed in January 2006. Triton is a Delaware limited liability company and has its principal place of business at 34232 Pacific Coast Highway Suite B, Dana Point, California 92629.

183.    TPFI is a closed-end business development company registered as a business development company under the Investment Company Act of 1940, as amended (the "1940 Act"). It is a Maryland corporation and its principal address is 6701 Center Drive West, Suite 1450, Los Angeles, CA 90045. During all periods relevant to this action, TPFI was named TPFI and it was an advisory client of TPA and a broker-dealer client of Triton.

184.    TPA is an investment adviser. It is a Delaware limited liability company. It was formerly an SEC registered investment adviser. TPFI (then known as Triton Pacific Investment

Corporation) was one of its clients. It is currently an exempt reporting adviser. Its principal address is 6701 Center Drive West, Suite 1450, Los Angeles, CA 90045.

185.    TPG is a member of TPA and is listed on Schedule A of TPA's SEC Form ADV. TPG is a California corporation. Its principal address is 6701 Center Dr. West, Suite 1450, Los Angeles, CA 90045. On information and belief, it is wholly-owned by Faggen or one or more trusts controlled by him.

186.    TPCC is a California limited liability company. Its principal address is 6701 Center Dr. West, Suite 1450, Los Angeles, CA 90045. On information and belief, it is directly or indirectly wholly-owned by Faggen or one or more trusts controlled by him.

187.    Faggen is the principal owner and control person of each of Triton, TPA, TPG and TPCC. He is a director of TPFI. During all periods relevant to this action, he was TPFI's Chairman of the Board and CEO. On information and belief, he is a California resident with an address of 13074 Kiyot Way Playa Vista, CA 90094

188.    Buehler is President of Triton. On information and belief, he is a California resident with an address of 115 Monarch Bay Drive, Dana Point, CA 92629.

189.    Carroll is Chief Financial Officer and Financial and Operations Principal of Triton. On information and belief, he is a resident of Virginia with a principal business address of 10800 Midlothian Turnpike, Suite 128, Richmond, VA 23235.

190.    Poole supports  Triton's compliance department, including support related to registration, licensing, and regulatory filing responsibilities. After she was hired by Triton, she worked closely with the CCOs. She was primarily responsible for preparing Triton's and its employees' regulatory filings. On information and belief, she is a resident of Virginia with a principal business address of 10800 Midlothian Turnpike, Suite 128, Richmond, VA 23235.

## Jurisdiction and Venue

191.    This Court has jurisdiction over the subject matter of MCS's counterclaims and additional claims pursuant to 28 U.S.C. § 1332, because  MCS is a citizen of a different state from each of Triton, TPA, TPFI, TPG, TPCC, Faggen, Carroll, Buehler and Poole and the matter in controversy on MCS's counterclaims and additional claims, exclusive of interest and costs, exceeds the sum or value of $75,000. In addition, Triton has consented to the jurisdiction of this Court.

192.    This Court possesses personal jurisdiction over Triton, TPA, TPFI, TPG, TPCC, Faggen, Carroll, Buehler, and Poole, because each of them does business in this state and/or because each of them has transacted business in this state and the counterclaims and additional claims arise from their transaction of business in this state.

193.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because MCS is a New York corporation and resides in this District and the parties' Contract at the heart of the dispute provides that any controversy arising thereunder will be settled by New York City courts.

## Factual Background

194.    MCS is a consulting firm that primarily provides compliance consulting services to broker-dealers and to investment advisers.

195.    Triton and its affiliates, including TPFI and TPA, all of which are controlled by Faggen, are recidivist violators of Applicable Securities Laws, even though it was not until the AWC that Triton received formal discipline.

196.    On June 28, 2013, well before Triton designated Barton as its CCO, FINRA issued a "cautionary action" to Triton. This cautionary action belies Triton's claim in paragraph 61 of its Complaint that Triton had never been disciplined as a FINRA member. A cautionary

action is informal discipline. A cautionary action is issued by FINRA after an investigation has

concluded with a finding that one or more serious violations occurred, but that FINRA has

determined not to recommend formal disciplinary action. FINRA Notice to Members 09-17

provides that while cautionary action letters are not formal discipline, they "are considered by

the staff in any future disciplinary matters." Due to the multiple serious violations recited in the

cautionary action, including, ironically, a registration violation similar to the violation resulting

in the AWC, it is clear that FINRA took it into consideration in commencing the enforcement

action leading to the AWC. The cautionary action recited the following violations:

- NASD Rule 1031 Registration Requirements by permitting a person to receive brokerage commissions paid by Triton without such person being registered.
- Securities Exchange Act Rule 17a-(f) by Triton not being a party to an electronic storage medium agreement, by having inadequate email storage and retention and by not retaining evidence that emails were reviewed over a period of two years.
- FINRA Rule 3270 and FINRA Bylaws by not properly disclosing outside business activities of certain officers and directors of Triton.
- FINRA Rule 3320(c) by not conducting anti-money laundering reviews.
- NASD Rules 2210(b) and 3010(b) by permitting a representative to maintain an unapproved and unreviewed LinkedIn account.
- Securities Exchange Act Rule 10b-9 regarding prohibited representations in connection with certain offerings and Securities Exchange Act Rule 15c2-4 by regarding transmission or maintenance of payments received in connection with underwritings. The cautionary action stated that, with respect to three offerings, Triton did not establish an escrow account and disbursed fuds prior to meeting minimum requirements.
- Securities Exchange Act Rule 15c3-1 (net capital) and Securities Exchange Act Rule 17a-3(a)(11) (records) as a result of mishandling customer funds that held to be held on its books, it overstated its net capital by over $9 million.
- NASD Rule 3010(a) for improper supervision as Triton Pacific Capital Partners (TPCP) acted as an unregistered broker dealer due to Faggen seeking to rely on the issuer safe harbor. However, as Faggen was a FINRA representative, the issuer safe harbor was not available to TPCP.
- NASD Rule 2310, NASD Rule 3010(b)(1)and NASD Rule 3110(c) for failing to obtain new account information, conduct suitability analyses or customer identification review on 12 investors in offerings of two funds.
- NASD Rule 3010(b) by not implementing firm WSPs in reviewing Form D filings for four funds/offerings, resulting in such Form Ds being filed between 84 and 238 days late.

197.    In 2014, FINRA conducted an examination of Triton and found multiple egregious violations of Applicable Securities Laws. On information and belief, Defendant states that the number and types of violations identified in the 2014 examination, several of which were recidivist in nature from the prior FINRA exam, likely caused FINRA to commence the enforcement action that led to the AWC. For example:

- A violation of FINRA Bylaws by failing to register the branch office of FinOp, Michael Carroll (CRD No. 139919), located at 13807 Village Mill Drive, Suite 312 Midlothian, VA. Carroll received and forwarded ten (10) checks from investors at this unregistered location during the three (3) month period, June 1, 2014 through August 31, 2014. Pursuant to the FINRA By-Laws and NASD Rule 3010(g)(2)(A), locations which receive customer funds must be registered as a branch office of the firm.

- Violations of FINRA Rule 2111 – Suitability and NASD Rule 3010(b) by failing to obtain the risk tolerance, investment experience, liquidity needs, time horizon and other investments for four (4) out of four (4) retail customers that purchased shares in the firm's affiliated offering, Triton Pacific Investment Corporation, as required by FINRA Rule 2111, and the firm's Written Supervisory Review Procedures (Section 8.0– Suitability for Customer Transactions). FINRA's letter indicated that this was a repeat violation from the 2012 examination of Triton.

- Violations of Rule 3270.01 – Obligations of Member Receiving Notice and NASD Rule 3010(b) by failing to conduct a review of registered representative (RR), Cari S. Spicer's (CRD no.2387382), disclosed outside business activity with Member Firm, Cavu Securities (CRD no. 6906), as required by FINRA Rule 3270.01, and the firm's Written Supervisory Procedures (Section 2.01 – Outside Business Activities).

- Failing to comply with Securities Exchange Act Rule 15c3-3 by failing to promptly forward two (2) out of sixty-nine (69) checks received from investors during the period, November 25, 2013 through August 12, 2014. Pursuant to Triton's current FINRA Membership Agreement, and pursuant to the 15c3-3(k)(2)(i) exemption, Triton was not permitted to hold customer funds or safe-keep customer securities.

- Violations of NASD Rule 2210(b) – Approval and Recordkeeping and NASD Rule 3010(b) by failing to implement its written policy pertaining to social media. FINRA's letter stated that this was a repeat violation from the 2012 examination.

- Failing to comply with Securities Exchange Act Rule 10b-9 by distributing funds from an escrow account established for Triton Pacific Investment Corporation (TPIC), an affiliated offering, prior to meeting the $2,500,000 minimum contingency, as required by the offering's prospectus dated November 1, 2013.

198.   As previously noted, Faggen is directly or indirectly the sole owner of a group of companies under the "Triton Pacific Group," including TPA, formerly the investment adviser to TPFI. The SEC examined TPA and its client TPFI in Q1 2017 and uncovered a number of material violations of the Investment Advisers Act of 1940, as amended and the 1940 Act, and the rules promulgated under each of such acts.

199.   Such noted violations included multiple breaches by TPA of its fiduciary duty, engaging in fraud against clients, failing to disclose material conflicts of interest, misleading investors, deficient board material, failing to approve advisory contracts in a manner required by Section 15 of the 1940 Act, holding improper board meetings for items that required in-person meetings, making untrue statements of material facts to investors and the SEC, engaging in unauthorized affiliate transactions and failing to adopt policies and procedures in three critical areas, among other things.

200.   Buehler has a very troubled regulatory history. On June 13, 2000, he was fired by his employer after his customer complained that Buehler enticed the customer to buy shares of a stock that Buehler himself owned. Buehler's then-employer, Merrill Lynch, settled the matter for $13,726 and then fired him for, among other things, selling a stock that was not covered by Merrill Lynch research. This led to Merrill Lynch taking the unusual step of reporting on his Form U5 that he had been fired.

201.   In December 2013, MCS agreed to provide certain compliance consulting services to Triton. MCS and Triton entered into the Contract, a formal, written agreement that specified the respective responsibilities of the parties and that set forth the representations and warranties that the parties made to each other. The Agreement clearly stated a number of critical points. First, and most important, the role of MCS was limited in scope and Triton, not MCS,

ultimately was responsible for the proper design and performance of Triton's own internal controls and compliance program, and MCS was not the guarantor of the successful performance of Triton's own internal controls and compliance program. Further, after Triton designated the CCOs, they had no authority, implied or otherwise, to one-hundred percent ensure Triton's regulatory compliance. In Section 1, MCS agreed to "provide compliance support and business consulting services," but Triton would "make all decisions with respect to the engagement hereunder." Section 2(a) stated that MCS "[s]hall report to, [and] work under the direction of" Triton. In Section 2(c), Triton agreed that it "[s]hall perform the tasks, furnish acceptable personnel, provide the resources and undertake the responsibilities set forth in this Contract." Section 2.e. of the Contract discloses that Triton:

> "[s]hall be *responsible* for establishing and maintaining an adequate and effective internal control system, *compliance program*…and *compliance functions*." [Emphasis added]

202.    Elsewhere, the Contract underscores these responsibilities of Triton. Section 3 contains the parties' "Representations and Warranties" and in Section 3(c) Triton "acknowledge[d] to MCS that:

> "…it is Client's responsibility to design, establish and maintain a system of internal accounting controls and *compliance program in compliance with applicable Rules*, and (ii) acknowledges to Mission Critical that it is Client's *responsibility to comply with required applicable Rules*." [Emphasis added]

203.    To put still more emphasis on the point that Triton alone was responsible for its own internal control systems and compliance with applicable rules, Triton "recognize[d]" in Section 2(e) that Triton "shall be fully and solely responsible for applying independent business judgment with respect to the services and work product provided by Mission Critical, to make implementation decisions, if any, and to determine further courses of action with respect to any

matters addressed in any advice, recommendations, services, . . . or other work product . . . provided by Mission Critical" to Triton.

204.    Section 5 is titled "Responsibility of Information" and it makes clear that MCS is entitled to rely on all information Triton provides to MCS, that Triton is responsible for the accuracy for all such information, and that Triton releases MCS from certain liability that may arise from the information Triton provides to MCS. Section 5(c) first describes Triton's duty to provide accurate information:  "Mission Critical shall be entitled to rely on the accuracy of all information provided by, and decisions and approvals of, Client in connection with Mission Critical's work hereunder." Then Triton gives its release: "Client hereby releases Mission Critical . . . from any liability and costs relating to the services hereunder to the extent such liability and costs are solely attributable to any information provided by Client, its officers, directors, members and/or all personnel that is not complete, accurate or current in all material respects."

205.    Triton, Faggen, Buehler, Carroll, and Poole repeatedly provided MCS and the CCOs with false information concerning Buehler's status and activities at Triton. Rather than cause Buehler to take the Series 24 examination and obtain the necessary license, Triton, Faggen, Buehler, Carroll, and Poole participated in preparing and issuing a series of filings and other written statements in which they concealed the fact that Buehler was carrying out principal activities at Triton. In these documents, they stated that only Faggen was exercising principal activities.

206.    FINRA recited three kinds of conduct that Buehler undertook without obtaining the Series 24 license. These were (i) identifying himself as President, (ii) hiring and firing

registered representatives and (iii) making determinations regarding sales bonuses to registered representatives from brokerage commissions. Items (ii) and (iii) were concealed from the CCOs.

207.     Notably, FINRA rules do not require every officer of a broker-dealer to register as a principal; only those officers that are "actively engaged in management" must register. Thus, assuming no active engagement in management, which is what Triton, Faggen, Buehler, Carroll, and Poole represented to the CCOs to be the case, Buehler could have called himself President without a Series 24 license. At all times, Triton's Form BD stated Faggen was President through 2016 and then CEO, and Faggen's U4 stated he was President.

208.     Triton, Faggen, Buehler, Carroll, and Poole also failed to establish and maintain an adequate and effective internal control system and compliance program. If they had established and maintained such systems and controls, Buehler would not have been able to evade his obligation to obtain the Series 24 license.. Based on instructions from Barton, a Series 24 window was opened for Buehler on what MCS understands and believes was the day Buehler started employment, July 20, 2015. That window remained open until November 2015. When that initial window expired, Barton opened a new Series 24 window for Buehler, and that window remained open until April 2016. Even though it was Triton's responsibility to make sure that Triton was in compliance with all applicable rules, no one at Triton caused Buehler to take the Series 24 examination.

209.     When DiFiore became CCO, she reminded Buehler to take the examination, and she encouraged him to study for it.

210.     In addition to the improper acts that led to his termination by Merrill Lynch, Buehler effectively refused to take the Series 24 while at Triton despite being informed that he needed to.

211.     When informed that his title would need to be changed after the FINRA examiner

identified the serious registration issue, his response:

> "Doesn't matter – call me "National Wholesaler"—its will change back to President
> in 90 days ☺."

212.     This evidences the callous disregard for securities laws and applicable regulations

that Triton, Faggen, Buehler, Carroll, and Poole displayed.

## COUNT I
## Breach of Contract—Breach of Representations and Warranties by Triton and Faggen, Buehler, Carroll and Poole

213.     Section 3.c. of the Contract states that it is Triton's responsibility to design,

implement and maintain an effective compliance program and to comply with applicable laws,

rules and regulations. By entering into the AWC, Triton acknowledged and agreed that it had

violated the registration rules. This constitutes a prima facie breach of the Contract by Triton as

it now seeks to recover damages from MCS despite its own material breach.

214.     The Complaint multiple times indicated that Triton tried to abdicate its

compliance responsibilities to MCS (without MCS' knowledge) in breach of said Section 3.c.

215.     Section 5.c. of the Contract provides that MCS will be entitled to rely on the

accuracy of information provided by Triton. Triton, through Faggen, Buehler, Carroll and Poole,

told the CCOs that Buehler would have, or had, no authority to act as principal. This was untrue.

Further, when DiFiore prepared an AML report in February 2016 (before she became CCO) that

listed Faggen as President, Carroll and Poole informed DiFiore that the information therein,

including specifically Faggen's title and role, was accurate. By its Complaint, Triton seeks to

blame MCS for erroneous information it provided regarding the unauthorized activities of

Buehler.

216.     Triton's breach of the Contract and the resulting threats of legal action against

MCS and this action have caused MCS to incur damages and related legal expenses in an amount

to be proven at trial.

### COUNT II
### Indemnification of MCS by other Parties to the Contract

217.     Section 5.d. of the Contract provides a broad indemnity as against any judicial

proceeding brought against MCS involving the Contract Parties.

218.     Triton has brought a Proceeding (as defined in the Contract) against MCS.

219.     Other than Triton, no Contract Party has joined the Proceeding.

220.     Section 5.d of the Contract includes:

> "Client understands and agrees that because of the relationship established between the Parties pursuant this Agreement, Mission Critical … may be requested by a ... judicial agency, or by other third parties, (collectively, the "Agencies"), whether by summons, … or judicial proceeding, provide written or oral information and documentation to … Agencies relative to [a] … judicial or private legal proceeding (collectively, the "Proceedings") involving the Client.

> In such event, the Client hereby agrees to compensate Mission Critical, at the rates set forth in this Agreement, for time spent by Mission Critical, its principals, officers, employees, consultants, independent contractors and agents in relation to such Proceedings. Client also agrees to reimburse Mission Critical for all costs and expenses incurred by Mission Critical, including, but not limited to, reasonably attorney's fees, as well as costs and expenses incurred by Mission Critical in investigating or preparing for such Proceeding, in giving testimony or in furnishing information and documents. Client's obligations pursuant to this paragraph shall be applicable regardless of the cause or nature of the Proceeding. This paragraph shall remain enforceable and valid at all times and shall survive termination of this Agreement."

221.     MCS is entitled to have TPFI and TPA indemnify MCS in accordance with

Section 5.d. of the Contract in an amount to be determined at trial, but not less than $1,000,000,

including MCS' costs and expenses of defending itself, including attorneys' fees and, although

MCS disputes it owes any damages to Triton, any resulting damages.

## COUNT III
### Common Law Fraud by Triton, Faggen, Carroll, Buehler and Poole

222.     Triton, through Faggen, Buehler, Carroll, and Poole, represented to MCS and the CCOs that Buehler was not carrying out principal activities at Triton.

223.     MCS and the CCOs relied on the accuracy of that representation. Under the Contract, MCS and the CCOs were entitled to rely on the accuracy of that representation. In addition, in light of the communications between the CCOs and the representatives of Triton, it was reasonable for MCS and the CCOs to rely on that representation.

224.     By relying on the fraudulent misrepresentations of Triton, Faggen, Buehler, Carroll, and Poole, MCS has been harmed by the initiation of this action, which will cause it to incur significant damages and related expense sf in an amount to be proven at trial, but not less than $1,000,000.

## COUNT IV
### Defamation—Damages

225.     Section 5.k. of the Contract contains a mutual non-disparagement clause.

226.     Triton submitted a corrective action statement in connection with the AWC that included a defamatory and/or disparaging statement regarding MCS and DiFiore as follows:

> "As a corrective measure, TPS terminated its relationship with its former compliance officer and has hired a new compliance officer that it believes will be more informed with respect to the various rules and regulations governing the conduct of the firm's business, to avoid issues such as those raised in the AWC."

227.     The foregoing statement is false, disparaging and defamatory because there can be no dispute that each of the CCOs brought Buehler's Series 24 registration issue to the attention of Triton, and that there were false regulatory filings and other documents submitted or prepared by Triton that the CCOs and MCS relied on.

228.    DiFiore was fully informed and aware of the various rules and regulations governing the conduct of Triton's business, and she was a competent and experienced compliance professional with the appropriate credentials and FINRA registrations.

229.    The CCOs, by not permitting Triton to file incorrect Form BDs, in fact prevented Triton multiple times from violating Section 15 of the Securities and Exchange Act of 1934, as amended, and the rules promulgated thereunder.

230.    Triton voluntarily entered into the AWC, which it was not required to do. By entering into the AWC, it agreed that it, and only it, was responsible for the improper activities of Buehler described therein as follows:

> "With the firm's knowledge, the general securities representative functioned as a principal by, among other things. identifying himself as the firm's President, being involved in decisions regarding the employment status of other registered representatives at the firm and being involved in the distribution of sales bonuses to two registered representatives."

231.    According to the AWC, as soon as Buehler was hired by Triton, he immediately began acting as a principal without a Series 24 license, even after Triton itself had opened a Series 24 examination window for him, which was done because Barton had informed Triton that he would need to pass such examination before acting in a principal activity.

232.    By submitting the corrective action statement, Triton disparaged and defamed MCS, Barton and DiFiore in violation of Section 5.k. of the Contract.

233.    By bringing this suit, Triton has further harmed MCS' reputation, without factual basis or justification.

234.    An internet search for MCS and Triton generates multiple links to the Complaint and any internet user can readily download a copy of the Complaint and view the various

baseless, false, disparaging and defamatory allegations that Triton has made regarding MCS therein.

235.   Triton needlessly disclosed the names of Barton and DiFiore in the Complaint rather than simply referring to them as Triton's CCOs.

236.   Triton seeks to use the CCOs and MCS as scapegoats for its own compliance failings and negligence, and to harm their public reputations as part of that effort.

237.   Triton has threatened MCS with the hiring of a public relations firm and issuing a press release seeking to blame MCS for Triton's own negligence.

238.   MCS' hard-earned reputation as an excellent provider of compliance services has been seriously damaged as a result of the false statements in Triton's corrective action statement and the false allegations in the Complaint.

239.   Triton's breach of the non-disparagement clause and the bringing of this baseless suit have caused MCS to incur damages in an amount to be determined at trial, but not less than five million dollars ($5,000,000).

## COUNT V
## Defamation—Equitable Relief

240.   Section 5.k. of the Contract contains a mutual non-disparagement clause.

241.   Triton has threatened MCS with the hiring of a public relations firm and issuing a press release seeking to blame MCS for Triton's own negligence.

242.   Triton has indicated to MCS that it has not brought this suit because it believes that its actual damages are anywhere near the amounts sought in the Complaint. Rather, it has indicated that it brought this suit to "punish" MCS and also in an attempt to deflect blame from its own negligence and the negligence of its management team as to the repeated and systematic failures that led to the AWC.

243.    MCS has disparaged MCS by the making of the corrective action statement and by filing this baseless suit.

244.    MCS respectfully requests that the court enjoin Triton from further unlawful disparagement of MCS.

## COUNT VI
### Unjust Enrichment as to Triton, TPA, TPFI, TPG, TPCC, Faggen, Buehler, Carroll and Poole

245.    Buehler acted improperly in hiring registered representatives of Triton.

246.    Those registered representatives were hired to increase the revenues of Triton and the assets under management of TPFI, thereby allowing TPFI to make additional investments and grow its portfolio, as well as benfiting from economies of scale, and TPA in increased assets under management on which it could charge management fees. Triton Pacific Capital Partners and Triton Pacific Group, Inc., as the parents of these entities, were thereby unjustly enriched by the increased revenues of its subsidiaries.

247.    Triton, TPA and TPFI have been unjustly enriched as a result of Buehler's acting as an unregistered principal.

248.    Triton, TPA and TPFI's unjust enrichment accrued at MCS' expense.

## COUNT VII
### Frivolous and Meritless Cause(s) of Action

249.    Triton's Complaint boils down to a simple claim -- that the CCOs and therefore MCS failed to inform Triton that Buehler would need to take and pass the Series 24 exam before he could act in a principal capacity.

250.    As set forth above and as the evidence will show, the facts are the opposite.

251.    Triton sought to amend its Form BD in September 2015, including to list Buehler as President, and Barton prevented this from occurring.

252.    Triton and Buehler ordered a Series 24 training manual on October 21, 2015.

253.    After Buehler's initial 120-day Series 24 examination window expired, Barton opened a new Series 24 window.

254.    Triton sought to amend its Form BD in August 2016, including to list Buehler as President, the CCO prevented this from occurring.

255.    No internal supervisory matrix or branch office checklist or other document listed Buehler in any principal capacity.

256.    Buehler, under the direction of Faggen, engaged in making registered representative employment decisions and decisions on bonus payments to registered representatives, the two principal activities cited in the AWC. These activities were concealed from the CCOs.

257.    The Complaint spells out how Triton apparently believed it could delegate its compliance responsibilities to MCS, despite such delegation being (i) in direct violation of its own compliance policies and procedures; (ii) in direct violation of Applicable Securities Laws; and (iii) in breach of the Contract.

258.    In early 2018, Triton, through its counsel, first approached MCS regarding this matter. Triton provided MCS with a draft Complaint containing many of the allegations contained in the filed Complaint.

259.    In connection with discussions with Triton's counsel in 2018, MCS pointed out numerous false and incorrect statements in the draft Complaint.

260.     Nonetheless, the filed Complaint includes multiple false allegations, including the following:

- Paragraph 21: "The parties also specifically agreed that MCS would provide Triton with a CCO."
- Paragraph 32: "MCS provided Triton with two CCOs during the term of its engagement."
- Paragraph 46: "Neither MCS nor Barton sufficiently checked Buehler's registrations, and they did not inform him that he would be required to obtain a Series 24 license before he could serve as Triton's President."
- Paragraph 48: "Buehler had been designated as Triton's President for approximately eighteen months before MCS or the CCOs it provided to Triton advised Triton that Mr. Buehler had not met registration requirements."

261.     Given the foregoing, it becomes clear that Triton has filed a frivolous Complaint, and that MCS is entitled to its costs incurred in this proceeding, including its attorneys' fees.

## COUNT VIII
## Declaratory Judgment

262.     Triton, TPA and TPFI are parties to the Contract.

263.     MCS provided compliance support services to Triton, TPA and TPFI.

264.     For compliance services provided to it, Triton paid approximately $90,000.

265.     For compliance services provided to them, TPA and TPFI collectively paid approximately $189,000.

266.     Triton's damage claim of $280,000 represents all fees paid by Triton, TPA and TPFI combined to MCS between December 20, 2013 and May 31, 2017.

267.     The Complaint makes no allegations with respect to MCS' provision of compliance support services to TPA and TPFI.

268.     TPA and TPFI have not joined Triton's action.

269.     MCS re-alleges and incorporates by reference the allegations contained in the preceding paragraphs.

270.     Pursuant to Rule 57, Fed. R. Civ. P., MCS respectfully requests that the Court issues a declaratory judgment that fees paid to MCS for compliance support services provided to TPA and TPFI were proper and just and not in dispute.

271.     There is a bona fide justiciable and substantial controversy, as reflected by the allegations contained in (i) the Complaint and (ii) this Answer with Counterclaims.

272.     The pleadings in this action make plain that the justiciable and substantial controversy exists between parties with adverse legal interests as to either present or prospective obligations.

273.     An order of declaratory judgment in favor of MCS would serve a useful purpose in clarifying or settling the defined legal issues present in this action.

### COUNT IX
### Breach of Contract—Interest Owed to MCS by Entity Counter MCSs

274.     Section 4.d. of the Contract provides that Triton and its affiliated entities, TPFI and TPA, will be responsible to pay interest on any amounts invoiced and not paid within 30 days at a rate of the lesser of 1.5% per month or the maximum amount allowed by law.

275.     Between June 23, 2017 and November 11, 2017, Triton, TPA and TPFI withheld $19,250 due and owed to MCS for services rendered to all such parties prior to May 23, 2017.

276.     MCS now demands such interest in an amount to be adduced at trial.


### PRAYER FOR RELIEF

WHEREFORE, MCS pray as follows:

1.     That Triton take nothing by reason of its Complaint and that judgment be rendered in favor of MCS;

2.      That MCS be awarded its legal fees and all other expenses and costs incurred in

defense of this action;

3.      That MCS is granted all relief available to it by virtue of its counterclaims; and

4.      For such other relief as the Court deems proper.


DATED:        New York, New York
              August 12, 2019


                                THE GALBRAITH LAW FIRM

                                */s/ Kevin D. Galbraith*
                                Kevin D. Galbraith, Esq.
                                236 West 30th Street, 5th Floor
                                New York, New York 10001
                                (212) 203-1249
                                kevin@kevingalbraithlaw.com

                                *Counsel for Defendant*
                                *Counterclaim Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 12, 2019, I electronically filed the foregoing documents with the Clerk of the Court by using the CM/ECF system.

THE GALBRAITH LAW FIRM

By:     *Erick T. Haman*
        Erick T. Haman, Esq.

        236 West 30th Street, 5th Floor
        New York, NY 10001
        Phone: (212) 203-8134
        Fax: (646) 390-5935
        Email: erick@galbraithlawfirm.com