UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
                          :

**TRITON PACIFIC SECURITIES, LLC**

          *Plaintiff and Counterclaim Defendant,*

          *-v.-*

**MISSION CRITICAL SERVICES CORP.,**

          *Defendant and Counterclaim Plaintiff,*

          *-v.-*

**TRITON PACIFIC ADVISER, LLC,
TRITON PACIFIC INVESTMENT
CORPORATION, INC.,
TRITON PACIFIC CAPITOL PARTNERS, LLC,
TRITON PACIFIC INVESTMENT GROUP, LLC,
CRAIG J. FAGGEN, MICHAEL L. CARROLL,
BRIAN D. BUEHLER AND WENDY POOLE,**

          *Counterclaim Defendants.*

-----------------------------------------------------------------------x

Case No. 1:19-cv-05789 (PAE)

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

       Triton Pacific Securities, LLC ("Plaintiff"), for its Amended Complaint (the "Complaint") against Mission Critical Services Corp. ("Defendant"), alleges as follows based upon personal knowledge as to its own actions and on information and belief as to all other matters.

### NATURE OF THIS ACTION

       1.     Plaintiff, a registered broker-dealer, paid Defendant Mission Critical more than $280,000 to provide Plaintiff with a Chief Compliance Officer and ensure that Plaintiff and certain affiliates complied with securities industry laws, rules and regulations.  The result was a disaster: Due to Defendant's incompetence, Plaintiff was sanctioned with its first-ever regulatory fine, was forced to spend thousands of dollars in legal fees, and suffered irreparable harm to its reputation in a highly competitive field.  Defendant plainly is not, as its web site claims, "a leader in

compliance consulting," yet it induced Plaintiff to rely on its purported expertise to Plaintiff's very great cost.  Defendant must be held accountable.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendant are citizens of different states and the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is a New York corporation and resides in this district.

## THE PARTIES

4.      Plaintiff Triton Pacific Securities, LLC is a licensed broker-dealer formed in January 2006.  Plaintiff is a Delaware LLC and has its principal place of business at 34232 Pacific Coast Highway Suite B, Dana Point, California 92629.

5.      Defendant Mission Critical Services Corp. is a corporation formed under the laws of the State of New York.  Defendant has its principal executive office at 440 East 79th Street, Apt. 7CD, New York, New York 10075.  Defendant has a business address at 641 Lexington Avenue, 14th Floor, New York, New York 10022.

## FACTUAL BACKGROUND

6.      Plaintiff has been a licensed broker-dealer for more than a decade.  It has been a registered member of the Financial Industry Regulatory Authority ("FINRA") since May 2006. Plaintiff had never been sanctioned by FINRA or by any other regulatory body before it retained Defendant in December 2013.

A.  **Defendant's Representations Concerning Its Services**

7.      Defendant holds itself out as "a leader in compliance consulting" which, according to its current web site, is "celebrating 12 years in compliance and legal services."  Defendant's web site advertises "In Depth Knowledge of What Matters."  Defendant's web site also advertises "highly credentialed experts, former regulators and seasoned securities attorneys" who "specialize in aiding our clients with Compliance, Legal, Regulatory Filings, Accounting and Tax."

8.      As of mid-August 2018, the "Broker-Dealer Compliance" section of Defendant's web site specified a "non-exclusive list" of the "expert," "top level" services it provided. Defendant's mid-August 2018 web site (the "Former Web Site") stated at that time:

> Mission Critical Services' Broker-Dealer Compliance Services provides top level assistance through extensive compliance and legal experience. The compliance and legal experts at Mission Critical Services ("MCS") have developed methodologies to offer CCO outsourcing and consulting that assist broker-dealers: design and restructure processes, streamline compliance policies and procedures, adhere to rules and regulations and regulatory guidelines and improve the implementation of compliance programs. …
>
> MCS will mitigate your regulatory risks by designing and/or restructuring a compliance program that fits your business based on an independent risk assessment, gathering an inventory of your compliance obligations, and conducting a gap analysis mapped to your Written Supervisory Procedures . . . .
>
> MCS will conduct a mock regulatory examination of your broker-dealer, visit your broker-dealer's primary and satellite offices; schedule interviews of key personnel as well as Principals, conduct sophisticated compliance testing on books and records likely to be requested by a regulator, and prepare a written report of findings upon request. …
>
> CRD Administration. MCS will support regulatory filings and amendments including amendments to Form U-4 and the filing of Form U-5 of registered representatives; state notice filings; and perform an annual review of broker-dealer registration renewals . . . .

9.      Defendant's promises to provide "CRD Administration" services and to "perform an annual review of broker-dealer registration renewals" on its Former Web Site required it to review the registrations and qualifications of each of Plaintiff's principals, including its president and other officers.  "CRD" on Defendant's web site refers to FINRA's "Central Registration Depository" or "Web CRD," which is a database of firm and individual qualifications.  FINRA's

web site explains that "Web CRD contains the registration records of broker-dealer firms and their associated individuals including their qualification, employment and disclosure histories…"

10.     Defendant's "non-exclusive list" of its "general compliance services," according to its Former Web Site, also included ensuring compliance with FINRA requirements:

> FINRA requires retention of copies of each notice, circular and advertisement. MCS will analyze all existing and proposed advertising materials (including your company's website, blog and/or social media profile pages) and provide written comments and suggested revisions to ensure advertising materials are in accordance with the advertising rules and standards required by FINRA and the SEC. …

> MCS will provide additional assistance as needed with preparing and submitting regulatory filings via FINRA's Gateway system including FOCUS, SSOI and customer compliant disclosure filings. …

> MCS will conduct the annual compliance review pursuant to FINRA Rule 3120 and prepare a report to the member's senior management that details your broker-dealer's system of supervisory controls, a summary of the test results, and any additional or amended supervisory procedures that have been created in response to those results.

11.     Defendant's Former Web Site indicated that the approximately twenty-five types of services it described were provided to every Broker-Dealer Compliance client and that more compliance services are provided "as necessary or as requested."

12.     Defendant's Former Web Site encouraged potential customers to rely on and trust Defendant's expertise.  The "Regulatory Filings" section of the web site assured customers that, "[R]egistered investment advisers and broker-dealers have placed their confidence in Mission Critical Services to manage all aspects of their filing needs."  Defendant's current web site includes the same assurance.

13.     Defendant's services at the time of its Former Web Site, and at all prior times relevant to this Complaint, included placing "experts" with clients to serve as their chief compliance officers ("CCOs").  The CCO of a broker-dealer, as the name implies, is responsible

for ensuring that the broker-dealer complies with all applicable laws and regulatory requirements, including the rules and regulations that FINRA enforces.

14.     A broker-dealer's CCO has an obligation to identify potential legal and regulatory compliance issues, to notify the broker-dealer's management about those issues, and to ensure that they are resolved.

15.     Like any corporate officer, a CCO is an agent of the company he or she works for and owes fiduciary duties to that company.

16.     Defendant's Former Web Site promised services to its broker-dealer clients that required Defendant, if it provided the client with a CCO, to take all reasonable steps to ensure that the President of the broker-dealer client satisfied all regulatory requirements before assuming his or her duties as President.

17.     Defendant's Former Web Site promised its broker-dealer clients that, if Defendant provided the broker-dealer client with a CCO, the CCO would take all reasonable steps to ensure that the client would not be sanctioned for failing to comply with FINRA regulations.

18.     Defendant has modified the text of its Former Web Site.   Some of these modifications attempt to limit the contractual and fiduciary obligations that Defendant promised clients it would assume at the time of the Former Web Site and at all prior times relevant to this Complaint.

19.     The "Broker-Dealer Compliance" section of Defendant's web site as of June 17, 2019 (the "Current Web Site") stated:

> Mission Critical Services ("MCS") provides state of the art brokerdealer compliance services. Our compliance experts have deep regulatory experience and have developed methodologies that help broker **dealers** quickly restructure compliance programs that adhere to laws, rules and regulations, as well as improve the overall quality of compliance. The following is a list of services that may be provided.

- **Compliance Program Design & Restructuring.** MCS will mitigate your regulatory risks by designing and/or restructuring a compliance program that fits your business based on an independent risk assessment, gathering an inventory of your compliance obligations, and conducting a gap analysis mapped to your written supervisory procedures. If a need is identified, MCS can recommend a properly qualified CCO.
- **Written Supervisory Procedures.** Broker-dealers are required to maintain written supervisory procedures manual. MCS professionals will modify and/or update your written supervisory procedures to be properly tailored to your business activities based on an inventory of your compliance obligations, together with ever-changing laws, rules regulations and regulatory guidelines.
- **Mock Regulatory Examinations.** MCS will conduct a mock regulatory examination of your broker-dealer; visit your broker-dealer's primary and satellite offices; schedule interviews of key personnel, conduct sophisticated forensic compliance testing on books and records likely to be requested by a regulator, and prepare a written report of our findings.
- **Marketing Activities & Advertisement Reviews.** FINRA requires retention of copies of each notice, circular and advertisement. MCS will analyze all existing and proposed advertising materials (including your company's website) and provide written comments and suggested revisions to ensure advertising materials comply with advertising rules and standards required by FINRA and the SEC. MCS will review all marketing activities to determine if your activities are consistent with regulatory rules as well as your Written Supervisory Procedures.
- **CRD Administration.** MCS will support regulatory filings and amendments including amendments to Form U-4 and the filing of Form U-5 for registered representatives, state notice filings and perform an annual review of broker-dealer registration renewals.
- **New Membership Applications.** MCS assists organizations in becoming approved with FINRA. We are experts at navigating the NMA process. We develop the appropriate business plans, WSPs, AML manuals, Business Continuity Plans and the remainder of the vast set of documents required for FINRA approval. Working with MCS will help your firm start generating revenue.
- **Continuing Membership Applications.** MCS helps guide your firm through the CMA process to provide the best guidance to make the process as seamless as possible.
- **Regulatory Filing Support.** MCS will provide additional assistance as needed with preparing and submitting regulatory filing via FINRA's Gateway system including FOCUS, SSOI and customer compliant disclosure filings.
- **Continuing Education Program.** MCS will conduct a needs analysis and prepare a customized compliance training program and presentation for registered representatives and other associated persons and hold compliance training sessions through on-site visits and/or by webinar.
- **Annual Review/Compliance Assessment.** MCS conducts annual compliance reviews pursuant to FINRA Rule 3120 and prepares reports for the member's senior management that details your brokerdealer's system of supervisory controls, a summary of the test results and any additional or amended supervisory procedures that have been created in response to those results.

- **Regulatory Examinations**.  When your broker-dealer is examined by FINRA and/or the SEC, MCS will serve as point person to the regulators by participating in interviews, corresponding in writing with regulators and assisting with document requests and deficiency letter writing. MCS will gather requested documents pursuant to regulatory examination request letters, review the documents for completeness and organize the documents in examination format for easy inspection by a regulator.
- **Compliance Calendar**.  MCS prepares customized, detailed compliance calendars listing what must be filed with whom and when. The calendars include all the steps necessary to adequately implement the compliance program. We also hold monthly compliance calls to discuss the compliance calendar.
- **Cybersecurity.**  MCS develops will write or update written supervisory procedures to keep in line with regulatory requirements for protecting personally identifiable information for your clients. MCS also conducts cybersecurity training and compliance testing.
- **Branch Office Supervision.**  MCS develops written supervisory procedures that are tailored to your broker-dealer branch offices. Also, MCS performs reviews to ensure that appropriate procedures unique to remote/ branch offices are being followed.
- **Email & Instant Messaging Surveillance**. MCS will conduct surveillance reviews of emails and instant messages in accordance with regulatory rules and guidelines. Our reviews are memorialized in compliance memoranda, which can be used to demonstrate to regulators that reviews were conducted and that any potential "red flag" communications were dealt with appropriately.
- **FinCEN 314(a) Searches & OFAC Checks**.  MCS will serve as AML officer responsible for your broker- dealers AML compliance program. We will also be responsible for the implementation of your AML program and AML manual including conducting new account opening reviews, OFAC checks and FINRA 314(a) searches.
- **AML Audits**. MCS can perform independent AML Audits to help your firm comply with the annual requirements.
- **Contract Review**. MCS will review existing and new contracts to determine the impact on the broker-dealers' compliance program and Written Supervisory Procedures and ensure adherence to contractual obligations.
- **New Account Opening**.  MCS will assist the front and back office in supporting the new account opening progress, including preparing a checklist of documents that are required to be maintained and follow up with the relevant individuals and clients to obtain all necessary documentation.
- **Broker-Dealer Agreement Updates**.  MCS can review and update agreements/contracts for your broker-dealer services to ensure that provisions required by FINRA and the SEC are included or provisions prohibited by laws, rules and regulations are excluded.
- **Regulation S-P Testing**. MCS will examine your broker-dealer's infrastructure and processes to analysis how you manage non-public customer account inform action (sic) and determine data and whether you comply with Regulation S-P and your privacy policy and prepare an audit report detailing our findings.
- **Employee Trading**. MCS will independently obtain and review personal brokerage account statements of all required individuals to determine if personal trading

activities are in compliance with written supervisory procedures including any restricted/watch lists maintained by the brokerdealer.

- **Outside Business Activities/Conflict of Interest Review.** MCS will conduct a conflicts of interest review and monitor all OBA activities of individuals to determine if such activities are in compliance with FINRA rules and written supervisory procedures.
- **Undisclosed Disciplinary Action Reviews.** MCS can help research and confirm whether any supervised persons have not disclosed disciplinary history.
- **Business Continuity/Disaster Recovery Plans.** Regulators impose scrutiny on broker- dealers to ensure that client information and investments are protected in the event of a significant business disruption. MCS can develop plans to maintain effective business operations under the circumstances.

(*See* Defendant's Current Web Site (italics added).)

### B. <u>Plaintiff Entered into a Services Agreement with Defendant</u>

20.     Plaintiff entered into a written agreement with Defendant as of December 20, 2013 (the "Agreement").

21.     The Agreement provided that "Mission Critical shall provide compliance support and other business consulting services to client."   The Agreement did not specify what "compliance support and other business consulting services" (the "Compliance Services") meant.

22.     Plaintiff entered into the Compliance Services Agreement in reliance on (A) Defendant's oral representations concerning what "compliance support and other business consulting services" meant; and (b) the information Defendant provided about its services through its web site.

23.     Plaintiff reasonably believed when it entered into the Agreement, based on Defendant's representations, that Defendant's "compliance support" included all of the services listed on Defendant's Former Web Site to the extent Plaintiff needed them.

24.     Plaintiff and Defendant made additional agreements after entering into the Agreement which clarified the scope of Defendant's "compliance support and other business consulting services."

25.     Plaintiff and Defendant agreed after the Agreement was signed that Defendant would provide Plaintiff with competent CCOs, though providing CCOs was not mentioned in the Agreement.

26.     Plaintiff understood at all relevant times that Defendant's "compliance support" services, and Defendant's provision of CCOs to Plaintiff, would protect Plaintiff from incurring regulatory sanctions.

27.     Plaintiff entered into the Agreement, and continued it in force, based on Defendant's representations that it was able (a) to provide Plaintiff with competent CCOs if requested, and (b) to perform all of the services described on its Former Web Site in a competent and professional manner to the extent Plaintiff needed them.   Defendant made these representations in negotiations leading up to Defendant's retention and by means of Defendant's web site at the time the Agreement was signed.

28.     Plaintiff reasonably understood the parties' Agreement and subsequent agreements to mean that the "compliance support and other business consulting services" Defendant promised in the Agreement would include (a) providing Plaintiff with competent CCOs if requested, and (b) performing all of the services described on its Former Web Site in a competent and professional manner to the extent Plaintiff needed them.

29.     Defendant failed to provide Plaintiff with competent CCOs and failed to perform all of the services described on its Former Web Site in a competent and professional manner when Plaintiff needed them.

## C.  Defendant Provides Plaintiff with CCOs

30.     The Agreement continued in effect for a period of approximately three and one-half years.  Throughout that period, Defendant was obligated to provide Plaintiff with competent

Compliance Services and, when CCOs were provided, Defendant was obligated to provide capable CCOs.

31.     By providing Plaintiff's CCO, Defendant assumed responsibility for Plaintiff's processes for ensuring compliance with its legal and regulatory obligations.

32.     By providing Plaintiff's CCO, Defendant assumed responsibility for ensuring that all of the Compliance Services Plaintiff needed were provided in a competent manner.

33.     Plaintiff paid Defendant more than $280,000 for the Compliance Services it provided under the Agreement between December 2013 and May 2017 for Plaintiff and for services to certain affiliates.  Plaintiff paid Defendant more than one-third of the $280,000 for services provided exclusively to Plaintiff.

34.     Defendant assumed fiduciary duties to Plaintiff throughout the course of its engagement by, at a minimum, providing Plaintiff with CCOs who were, by virtue of their position, responsible for ensuring Defendant's compliance with all applicable statutes, regulations and rules.

35.     Plaintiff placed its entire trust and confidence in Defendant and the CCOs it provided to perform the Compliance Services that Defendant promised in a competent manner and thus to ensure Plaintiff's compliance with all applicable statutes, regulations and rules, including those enforced by FINRA.

36.     Plaintiff placed its entire trust and confidence in Defendant and the CCOs it provided to ensure that Plaintiff would not be subject to regulatory sanctions.

37.     Defendant knew that Plaintiff placed its entire trust and confidence in Defendant and the CCOs it provided to perform the Compliance Services that Defendant promised in a competent manner and to ensure that Plaintiff would not be subject to regulatory sanctions.

Defendant also encouraged Plaintiff to place its entire trust and confidence in Defendant and the CCOs it provided at all relevant times.

38.     In effect, by retaining Defendant to provide Compliance Services, Plaintiff was entrusting Defendant with the entire future of its business.  If Plaintiff, as a registered broker-dealer, violated applicable laws or regulations – even inadvertently – the harm to its reputation could deprive it of the ability to obtain customers going forward.  Regulators could also force Plaintiff to shut down.

39.     Plaintiff gave Defendant and the CCOs it provided to Plaintiff with all of the information they needed to provide the Compliance Services in a competent manner and protect Plaintiff from regulatory sanctions.

40.     Defendant provided Plaintiff with two CCOs during the term of its engagement. Both lacked the necessary diligence, skills and expertise to perform their duties effectively.

41.     On or about November 13, 2014, Defendant provided Jeff Barton ("Barton") to serve as Plaintiff's CCO.  Less than two years later, on or about March 4, 2016, Defendant provided Monica DiFiore ("DiFiore") to serve as Plaintiff's CCO.  Barton served as Plaintiff's CCO until DiFiore took over.

42.     In providing Barton and DiFiore to serve as Plaintiff's CCOs, Defendant represented that they possessed the requisite credentials, training, experience and ability to serve as competent CCOs for Plaintiff.  Defendant also represented that Barton and DiFiore were competent to perform the Compliance Services Plaintiff contracted and paid for under the Agreement.

43.     Defendant designated Barton as CCO and informed Plaintiff before Barton became CCO that he would competently perform his assigned task:  ensuring that Plaintiff complied with applicable laws, regulations and rules, and protecting Plaintiff from regulatory sanctions.

44.     Defendant informed Plaintiff before DiFiore became CCO that she would competently perform her assigned task:  ensuring that Plaintiff complied with applicable laws, regulations and rules, and protecting Plaintiff from regulatory sanctions.

45.     Plaintiff paid Defendant for Barton and DiFiore's services.  Plaintiff did not pay either of them directly.

46.     Barton and DiFiore failed to ensure that Plaintiff complied with applicable laws, regulations and rules and did not protect Plaintiff from regulatory sanctions.

47.     Barton and DiFiore did not have the requisite credentials, training, experience and ability to serve as competent CCOs for Plaintiff or to perform the Compliance Services Plaintiff contracted and paid for under the Agreement.  Further, Defendant did not adequately investigate their capabilities or their ability to take responsibility for managing the entire compliance programs of companies for which they worked remotely and only part-time.

48.     Both Barton and DiFiore made elementary mistakes in managing Plaintiff's legal and regulatory compliance programs.  As a result, Plaintiff incurred very significant costs.

### D. Defendant Breached Its Agreements and Its Actions Showed that Its Representations Were False

49.     Defendant failed to provide the promised Compliance Services in a competent manner.  The result was a financially damaging and professionally embarrassing FINRA enforcement action against Plaintiff.

50.     While the Agreement was in effect, Plaintiff paid Defendant more than $280,000 in fees for itself and its affiliates, but Defendant and its designated CCOs performed the

Compliance Services for Plaintiff incompetently or not at all.  Further, Plaintiff discovered that Defendant's designated CCOs had a fundamental lack of knowledge and ability to oversee Plaintiff's operations, as well as a lack of core competency concerning elementary compliance issues relating to those business operations.

51.     Securities law requires that any managing officer of a securities business must be registered as a principal.  National Association of Securities Dealers ("NASD") Rule 1021(a) requires that "[a]ll persons engaged or to be engaged in the . . .  securities business of a member who are to function as principals shall be registered as such with NASD."

52.     NASD Rule 1021(b) defines principals to include, among others, "sole proprietors, officers, and partners who are actively engaged in the management of the member's . . . securities business, including supervision, solicitation, [or the] conduct of business . . ."

53.     An essential component of the Compliance Services that Defendant and its designated CCO were required to perform under the Agreement was to ensure that all of Plaintiff's personnel serving as principals were properly registered as such with the NASD.  Defendant and its designated CCO were also required to ensure that any of Plaintiff's personnel who were not appropriately registered with the NASD did not take any action or perform any services on Plaintiff's behalf for which a supplementary registration would be required.

54.     Defendant failed to ensure that all of Plaintiff's personnel serving as principals were properly registered as such with the NASD.  Defendant also failed to ensure that Plaintiff's personnel who were not appropriately registered with the NASD did not take any action or perform any services on Plaintiff's behalf for which a supplementary registration would be required.

55.     On July 1, 2015, while Defendant's Jeff Barton served as Plaintiff's CCO, Brian Buehler joined Plaintiff as an employee and was designated as its President.  Neither Defendant

nor Barton informed Buehler that he would be required to obtain a Series 24 license before he could identify himself as Plaintiff's President in any context or perform certain "supervisory" functions.

56.     If Defendant had performed the Compliance Services it promised competently, or had conducted routine reviews of Plaintiff's broker-dealer compliance obligations, it would have identified any gaps in Plaintiff's employee registrations on a timely basis and would have ensured that Plaintiff addressed them promptly, thereby avoiding any regulatory sanctions.  Defendant also would have protected Plaintiff from regulatory sanctions by advising Mr. Buehler as to exactly what he could and could not do prior to obtaining a Series 24 license.

57.     Mr. Buehler had been designated as Plaintiff's President for approximately eighteen months, and FINRA had already raised the issue, before Defendant or the CCOs it provided to Plaintiff advised Plaintiff that Mr. Buehler could not identify himself as Plaintiff's President in any context.

58.     Defendant and its designated CCOs first learned that Mr. Buehler did not yet have the registrations necessary to serve as Plaintiff's president in July 2016, at or about the time he was hired.  However, Defendant and its CCOs did not inform Mr. Buehler that he could not identify himself as Plaintiff's President in any context.

59.     Defendant and its designated CCOs knew that certain of Plaintiff's filings with the SEC in 2016 and 2017 designated Plaintiff's C.E.O. as its President but that Mr. Buehler was identified as Plaintiff's President in emails and other documents.  Defendant and its CCOs reviewed documents and emails identifying Mr. Buehler as Plaintiff's President but failed to inform Plaintiff that identifying Mr. Buehler as Plaintiff's President in any context violated

FINRA's rules and policies and could subject Plaintiff to sanctions. Defendant did not address this issue with Plaintiff until FINRA raised it with Plaintiff in May 2017.

60.     Defendant and its designated CCOs knew that Mr. Buehler could not act in a "supervisory" capacity without a series 24 qualification. Defendant and its CCOs failed to inform Plaintiff that certain of Mr. Buehler's actions were arguably "supervisory" and could subject Plaintiff to sanctions. Plaintiff was not advised of this issue until FINRA raised it in May 2017.

61.     Both of the CCOs whom Defendant provided to Plaintiff signed and filed regulatory documents for Plaintiff without ensuring that Mr. Buehler had the necessary certifications to serve as Plaintiff's President.

62.     By email dated May 12, 2017, FINRA contacted Plaintiff to confirm whether Mr. Buehler was serving as its President.

63.     On May 16, 2017, DiFiore advised Plaintiff that Buehler should obtain a Series 24 securities license to serve as Plaintiff's President. DiFiore's predecessor, Defendant's Barton, had never advised or suggested that Buehler was required to obtain such a certification before identifying himself as Plaintiff's President in any context or participating in corporate decisions as President.

64.     On May 18, 2017, FINRA advised Plaintiff that Buehler was required to have a Series 24 securities license to serve as Plaintiff's President.

65.     Because Defendant failed to ensure that Buehler was properly registered, Plaintiff was required to remove Mr. Buehler from his office as President after he had already been serving for almost two years. This damaged Plaintiff's reputation with its clients.

66.     On May 22, 2017, DiFiore filed the requisite form with FINRA removing Buehler as Plaintiff's President.

67.     On May 23, 2017, Plaintiff notified Defendant that it was terminating the Agreement.  Plaintiff terminated the Agreement because of Defendant's incompetence.

68.     On November 7, 2017, FINRA informed Plaintiff that it was referring the issue of Buehler's service as Plaintiff's President without a principal registration (the "FINRA Action") to FINRA's enforcement division.

69.     Plaintiff retained counsel and asserted defenses to the FINRA Action.  However, FINRA would not agree to dismiss the action.

70.     On January 11, 2018, Plaintiff resolved the FINRA Action by entering into Letter of Acceptance Waiver and Consent No. 2012052171901 (the "Consent Letter").  Plaintiff was forced to enter into the Consent Letter to avoid a potentially costly and time-consuming regulatory action.  The Consent Letter stated FINRA's findings that Plaintiff had violated NASD Rule 1021 and  FINRA Rule 2010.  Without admitting or denying FINRA's allegations, Plaintiff consented to entry of  FINRA's findings against Plaintiff and to the sanctions imposed by FINRA.

71.     As a result of the FINRA Action, and pursuant to the Consent Letter, Plaintiff paid a fine to FINRA of $10,000.00 and received a public censure.  Plaintiff had never been disciplined as a FINRA member before, and it has not been disciplined as a FINRA member since.

72.     As the FINRA Action demonstrated to Plaintiff's cost, Defendant and the CCOs it provided failed to provide Plaintiff with the Compliance Services required by the parties' Agreement.  Among other things, Defendant did not provide program risk analysis, mock regulatory examinations, competent review of marketing activity and advertisements, proper CRD administration or annual compliance reviews, and it did not make accurate regulatory filings.

73.     Further, Defendant did not mitigate Plaintiff's regulatory risks by designing, structuring or restructuring a compliance program, even though Defendant provided CCOs to take responsibility for ensuring Plaintiff's compliance.

74.     On or about December 19, 2017, Buehler was reinstated as President of Plaintiff after successfully obtaining his Series 24 securities license.

## COUNT I
## Breach of Contract

75.     Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 74 as if fully set forth herein.

76.     Defendant entered into the Agreement with Plaintiff as of December 20, 2013.

77.     Plaintiff fulfilled its obligations under the Agreement by paying all sums due.

78.     The Agreement required Defendant to provide competent Compliance Services, including each of the services listed on Defendant's Former Web Site, to the extent they were needed to ensure Plaintiff's compliance with applicable laws, regulations and rules.

79.     Defendant agreed that it would provide Plaintiff with a competent CCO.  By doing so, Defendant assumed a contractual duty to Plaintiff to ensure that (a) Plaintiff complied with all applicable laws, rules and regulations, and (b) Plaintiff was not subject to regulatory sanctions.

80.     The Agreement required Defendant to ensure that immediate steps were taken to ensure that, given Mr. Buehler's lack of a Series 24 license, he did not violate NASD Rule 1021 or FINRA Rule 2010.

81.     Defendant breached the Agreement by failing to investigate whether Mr. Buehler had all necessary licenses and registrations at the time he was appointed as Plaintiff's President.

82.     Defendant breached the Agreement by failing to inform Plaintiff until May 2017 that Mr. Buehler could not assume the role of Plaintiff's President or identify himself as such in any context until he obtained his Series 24 license.

83.     Defendant breached the Agreement by allowing Mr. Buehler to remain in office even after Defendant learned that he lacked a Series 24 license without taking sufficient remedial action to ensure compliance with applicable regulations.

84.     Defendant breached the Agreement by failing to ensure that immediate steps were taken to ensure that, given Mr. Buehler's lack of a Series 24 license, he did not violate NASD Rule 1021 or FINRA Rule 2010.  Defendant failed to inform Plaintiff or Mr. Buehler what he could and could not properly do without a Series 24 license until after FINRA had raised the issue.

85.     Defendant breached the Agreement by failing to perform the Compliance Services. If Defendant had performed the Compliance Services, it would have discovered at or around the time Mr. Buehler was appointed as Plaintiff's President that Plaintiff could be sanctioned because Mr. Buehler lacked a Series 24 license.

86.     If Defendant had performed the Compliance Services, it would have advised Plaintiff what Mr. Buehler could and could not do without a Series 24 license.

87.     Defendant's breach of the Agreement caused Plaintiff to incur the costs, expenses and legal fees of defending itself in a FINRA enforcement proceeding.

88.     Defendant's breach of the Agreement caused Plaintiff to be censured and fined by FINRA in the amount of $10,000 despite Plaintiff's efforts to defend itself.

89.     Defendant's breach of the Agreement caused Plaintiff to suffer substantial irreparable harm to its business and reputation because Plaintiff's President was forced to resign and Plaintiff was publicly sanctioned in a FINRA enforcement proceeding.

90.     An internet search concerning Plaintiff generates a link to a FINRA report that informs the reader about the FINRA Action and states that Plaintiff was censured and fined. *See* https://files.brokercheck.finra.org/firm/firm_139919.pdf.

91.     Plaintiff has lost business opportunities worth no less than $1,000,000, in an amount to be determined at trial, because of Defendant's breach of the Agreement.

92.     Plaintiff and its affiliates paid Defendant $280,000 under the Agreement for competent services that they did not receive.  Approximately $100,000 of that amount was paid exclusively for services to Plaintiff.  Plaintiff would not have paid Defendant for the services it promised to Plaintiff if Plaintiff had been aware that it was not receiving competent services.

93.     Defendant's breach of the Agreement proximately caused Plaintiff to incur damages in an amount to be proven at trial, but not less than $1,100,000.

94.     For the foregoing reasons, Plaintiff is entitled to judgment on Count I of its Complaint in an amount to be proven at trial, but not less than $1,100,000.

## COUNT II
### Breach of Fiduciary Duty

95.     Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 94 as if fully set forth herein.

96.     In providing Plaintiff with CCOs, Defendant represented to Plaintiff that Defendant and the CCOs it provided would be able to ensure Plaintiff's compliance with applicable statutes, regulations and rules.

97.     In providing Plaintiff with CCOs, Defendant assumed responsibility for ensuring that any Compliance Services that Plaintiff needed would be competently provided.

98.     Defendant and the CCOs it provided agreed to serve as Plaintiff's agents for the purpose of ensuring Plaintiff's legal and regulatory compliance.

99.    In providing Plaintiff with CCOs, Defendant induced Plaintiff to place its entire trust and confidence in Defendant and to rely on Defendant (a) to perform the Compliance Services competently and (b) to ensure that Plaintiff would not be subject to sanction for failing to comply with applicable policies, statutes, regulations and rules, including those enforced by FINRA.

100.    Because Defendant induced Plaintiff to place its entire trust and confidence in Defendant when it provided Plaintiff with CCOs, Plaintiff placed its entire trust and confidence in Defendant and relied on Defendant (a) to perform the Compliance Services competently and (b) to ensure that Plaintiff would not be subject to sanction for failing to comply with applicable policies, statutes, regulations and rules, including those enforced by FINRA.

101.    Defendant was aware that Plaintiff had placed its entire trust and confidence in Defendant and that it relied on Defendant (a) to perform the Compliance Services competently and (b) to ensure that Plaintiff would not be subject to sanction for failing to comply with applicable policies, statutes, regulations and rules, including those enforced by FINRA.

102.    By providing Plaintiff with CCOs to serve as Plaintiff's agents and by knowingly inducing Plaintiff to place its trust and confidence in Defendant, Defendant assumed fiduciary duties of care, loyalty and candor to Plaintiff (a) to perform the Compliance Services competently and (b) to ensure that Plaintiff would not be subject to sanction for failing to comply with applicable policies, statutes, regulations and rules, including those enforced by FINRA.

103.    Defendant owed Plaintiff fiduciary duties to identify promptly, and ensure that immediate steps were taken to address or remedy, Mr. Buehler's lack of a Series 24 license and any violation of NASD Rule 1021, FINRA Rule 2010 and any other statute, regulation or rule that might result from that lack.

104.    Defendant breached its fiduciary duties to Plaintiff by failing to investigate with reasonable thoroughness whether Mr. Buehler had all necessary licenses and registrations to identify himself as Plaintiff's President at the time he was appointed or at any other time before Defendant was subject to the FINRA Action.

105.    Defendant breached its fiduciary duties to Plaintiff by failing to investigate with reasonable thoroughness whether Mr. Buehler had all necessary licenses and registrations to participate in corporate decisions in an executive capacity until, at the earliest, more than one year after he was appointed as Plaintiff's President.

106.    Defendant breached its fiduciary duties to Plaintiff by failing to ensure that Mr. Buehler either stepped down as President or took other sufficient remedial actions until he had all necessary licenses and registrations to serve as Plaintiff's President.

107.    Defendant breached its fiduciary duties by failing to perform the Compliance Services.  If Defendant had performed the Compliance Services, it would have discovered at or around the time Mr. Buehler was appointed as Plaintiff's President that Plaintiff could be sanctioned because Mr. Buehler lacked a Series 24 license.

108.    If Defendant had performed the Compliance Services, it would have advised Plaintiff what Mr. Buehler could and could not do without a Series 24 license.

109.    Defendant's breach of its fiduciary duties caused Plaintiff to incur the costs, expenses and legal fees of defending itself in a FINRA enforcement proceeding.

110.    Defendant's breach of its fiduciary duties caused Plaintiff to be censured and fined by FINRA in the amount of $10,000 despite Plaintiff's efforts to defend itself.

111.    Defendant's breach of its fiduciary duties caused Plaintiff to suffer irreparable harm to its business and reputation because Plaintiff's President was forced to resign and Plaintiff was publicly sanctioned in a FINRA enforcement proceeding.

112.    An internet search concerning Plaintiff generates a link to a FINRA report that informs the reader about the FINRA Action and states that Plaintiff was censured and fined. *See* https://files.brokercheck.finra.org/firm/firm_139919.pdf.

113.    Plaintiff has lost business opportunities worth no less than $1,000,000, in an amount to be determined at trial, because of Defendant's breach of its fiduciary duties.

114.    Plaintiff and its affiliates paid Defendant $280,000 under the Agreement for competent services that they did not receive. Approximately $100,000 of that amount was paid exclusively for services to Plaintiff. Plaintiff would not have paid Defendant for the services it promised to Plaintiff if Plaintiff had been aware that it was not receiving competent services.

115.    Defendant was a faithless servant.

116.    In equity and good conscience, Defendant's faithless breach of its fiduciary duties requires it to disgorge and return the $100,000 it received for services it did not perform or did not competently perform.

117.    Defendant's breach of its fiduciary duties proximately caused Plaintiff to incur damages in an amount to be proven at trial, but not less than $1,110,000.

118.    For the foregoing reasons, Plaintiff is entitled to judgment on Count II of its Complaint in an amount to be proven at trial, but not less than $1,110,000.

119.    In addition, Defendant acted with conscious indifference to the consequences of its actions and omissions such that an award of punitive damages to punish, penalize, or deter Defendant from committing similar actions in the future is justified. Defendant's Current Web

Site, and its attempts to induce clients to rely on it as a fiduciary, are likely to result in, or have resulted in, Defendant harming other victims.  Because Defendant has acted with conscious indifference and specific intent to cause harm, there is no limitation on the amount that may be awarded as punitive damages. Plaintiff should be awarded punitive damages from Defendant in an amount to be determined at trial but not less than $1,000,000.00.

### COUNT III
### Unjust Enrichment

120.    Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 119 as if fully set forth herein.

121.    Plaintiff and its affiliates paid Defendant $280,000 under the Agreement for competent services that they did not receive.  Approximately $100,000 of that amount was paid exclusively for services to Plaintiff.  Plaintiff would not have paid Defendant for the services it promised to Plaintiff if Plaintiff had been aware that it was not receiving competent services.

122.    Defendant failed to perform some of the services it agreed to perform for Plaintiff in any respect.  Defendant failed to perform other services it agreed to perform for Plaintiff competently.

123.    To the extent that Defendant's failure to perform the services it agreed to perform is deemed not to be a breach of contract, Defendant has been unjustly enriched in the amount of $100,000.

124.    As a proximate result of Defendant's unjust enrichment, Plaintiff has suffered damages in the amount of $100,000 which, in equity and good conscience, Defendant is required to return.

125.    For the foregoing reasons, Plaintiff is entitled to judgment on Count III of its Complaint in an amount to be proven at trial, but not less than $100,000.

## COUNT IV
### Negligent Misrepresentation

126.    Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 125 as if fully set forth herein.

127.    Defendant represented to Plaintiff that it had the ability to perform the Compliance Services competently.  Defendant made these representations, without exercising reasonable care to ensure that they were true, both by means of its web site and in negotiations with Plaintiff.

128.    Defendant represented to Plaintiff that it was competent to mitigate Plaintiff's regulatory risks by designing and/or restructuring a compliance program that fit Plaintiff's business based on an independent risk assessment, gathering an inventory of Plaintiff's compliance obligations, and conducting a gap analysis.  Defendant made these false representations, without exercising reasonable care to ensure that they were true, both by means of its web site and in negotiations with Plaintiff.

129.    Defendant represented to Plaintiff that its practice was to ensure that every CCO it provided to clients possessed the requisite credentials, training, experience and ability to serve as competent CCOs and to perform the Compliance Services competently.  Defendant made these representations, without exercising reasonable care to ensure that they were true, in its negotiations with Plaintiff concerning providing Plaintiff with CCOs.

130.    Defendant knew, when it provided CCOs to Plaintiff, that it had failed to conduct reasonable investigations sufficient to determine whether those CCOs possessed the requisite credentials, training, experience and ability to serve as competent CCOs for Plaintiff and to perform the Compliance Services competently.

131.    Defendant's ability to provide Plaintiff with CCOs and Compliance Services that would protect it from regulatory sanctions was highly material to Plaintiff's decision to enter into the Agreement and pay Defendant's fees.

132.    Defendant's ability to provide Plaintiff with CCOs and Compliance Services that would protect it from regulatory sanctions was highly material to Plaintiff's decision to accept the CCOs Defendant offered.

133.    Plaintiff reasonably and justifiably relied on Defendant's false representations.

134.    Plaintiff was entitled to rely on Defendant's false representations because Plaintiff entered into a relationship of trust and confidence with Defendant which required Defendant to disclose the facts.

135.    Defendant knew or reasonably should have known that Plaintiff was relying upon its false representations in entering into the Agreement, paying Defendant's fees, and agreeing to accept the CCOs Defendant offered.  Instead, Defendant was reckless, grossly negligent or, at a minimum, negligent in failing to exercise due care to ensure that Plaintiff was not relying upon Defendant's false representations.

136.    Defendant would have known, if it had exercised due care, that Plaintiff was deceived concerning Defendant's ability to perform the Compliance Services competently and ensure the competency and expertise of the CCOs it provided to Plaintiff.  Instead, Defendant was reckless, grossly negligent or, at a minimum, negligent in failing to exercise due care to ensure that Plaintiff was not deceived concerning Defendant's ability to perform the Compliance Services competently and ensure the competency and expertise of the CCOs it provided to Plaintiff. Defendant was reckless, grossly negligent or, at a minimum, negligent in deceiving Plaintiff for its own profit.

137.    Defendant's recklessness, gross negligence or lack of due care induced Plaintiff to enter into the Agreement and to accept the CCOs Defendant offered.  Plaintiff does not allege fraudulent performance of the Agreement, but rather Defendant's lack of due care in inducing Plaintiff to enter into the Agreement and to agree to pay for accepting CCOs who were falsely represented to be competent.

138.    As a proximate result of its reliance on Defendant's false representations, Plaintiff has suffered damages in an amount to proven at trial, but not less than $1,110,000.00.

139.    Plaintiff is equitably entitled to rescind the Agreement, which it was deceitfully induced to enter, and to the return of its $100,000.

140.    Defendant's misrepresentations caused Plaintiff to incur the costs, expenses and legal fees of defending itself in a FINRA enforcement proceeding.

141.    Defendant's misrepresentations caused Plaintiff to be censured and fined by FINRA in the amount of $10,000 despite Plaintiff's efforts to defend itself.

142.    Defendant's misrepresentations caused Plaintiff to suffer irreparable harm to its business and reputation because Plaintiff's President was forced to resign and Plaintiff was publicly sanctioned in a FINRA enforcement proceeding.

143.    Plaintiff has lost business opportunities worth no less than $1,000,000, in an amount to be determined at trial, because of Defendant's misrepresentations.

144.    Plaintiff and its affiliates paid Defendant $280,000 under the Agreement for competent services that they did not receive.  Approximately $100,000 of that amount was paid exclusively for services to Plaintiff.  Plaintiff would not have paid Defendant for the services it promised to Plaintiff if Plaintiff had been aware that it was not receiving competent services.

145.    Plaintiff paid Defendant $280,000 for competent services that it did not receive and that Defendant could not genuinely provide.  Plaintiff would not have paid Defendant for services to Plaintiff or its affiliates if Plaintiff had been aware that Defendant was not capable of providing competent services or that Plaintiff was not likely to receive competent services.

146.    Defendant's misrepresentations proximately caused Plaintiff to incur damages in an amount to be proven at trial, but not less than $1,110,000.

147.    For the foregoing reasons, Plaintiff is entitled to judgment on Count IV of its Complaint in an amount to be proven at trial, but not less than $1,110,000.

**COUNT V**
**Retaliatory Misconduct in Breach of Contractual, Fiduciary and Legal Duties**

148.    Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 147 as if fully set forth herein.

149.    After Plaintiff's original complaint in this action was filed, Defendant demonstrated its determination to retaliate against Plaintiff by causing it harm irrespective of Defendant's contractual or fiduciary duties or the requirements of law.

150.    One way in which Defendant demonstrated its determination to retaliate against Plaintiff and cause it harm was by filing nine counterclaims against Plaintiff and eight additional defendants irrespective of the counterclaims' legal merit.

151.    Although Plaintiff provided Defendant with a draft complaint prior to filing its original complaint, Defendant did not offer Plaintiff a draft of its answer or counterclaims before determining to file it.  Defendant also cut off communications with Plaintiff after filing its counterclaims.

152.    Defendant's counterclaims included:

a.  A claim for breach of contract against four of Plaintiff's present or former employees, though none of them were parties to the contract that was allegedly breached (Count I);

b.  A claim for $1,000,000 in "indemnification" for the costs of the present action based on a contractual provision that expressly applies only to actions by governmental agencies or "other third parties," but not to actions brought by Plaintiff (Count II);

c.  A claim for "common law fraud" against Plaintiff and four of its present or former employees which does not allege (as the law requires) any specific misstatement by any of them; does not specify how, when or where any misstatements were made; does not allege scienter or materiality; and does not identify any damages other than Plaintiff's "initiation of this action" (Count III);

d.  A claim for "Defamation - Equitable Relief" to prevent Plaintiff from hiring a public relations firm to issue a press release blaming Defendant for the conduct alleged in this Complaint, though Plaintiff does not intend, and has never intended, to do so (Count V);

e.  A claim for "unjust enrichment" against Plaintiff and four present or former employees which neither alleges that Defendant gave anything of value to any of them nor seeks the return of any value provided by Defendant (Count VI);

f.  A claim for "frivolous and meritless cause(s) of action," though any such claim would be preempted by Rule 11, Fed. R. Civ. P. (Count VII).

153.    Defendant asserts its counterclaims against Plaintiff and eight counterclaim defendants, all of whom are Plaintiff's affiliates or its present or former employees.

154.    Four of the counterclaim defendants are individuals who do not live in New York, do not regularly do business here, and are not accused of any specific tortious acts in or directed at New York.  Defendant alleges that the court has personal jurisdiction over these individuals because "each of them does business in this state and because each of them has transacted business in this state and the counterclaims and additional claims arise from their transaction of business in this state."  To the best of Plaintiff's knowledge, this allegation is false.  Also, Defendant's counterclaims do not allege any specific action by any counterclaim defendant which took place in or was directed at the State of New York.

155.    The four additional counterclaim defendants other than Plaintiff are entities that are or were Plaintiff's affiliates (the "Affiliate Defendants").  Two of the Affiliate Defendants do not belong in this action:  Defendant mentions them only in its claim for "unjust enrichment," which does not allege that Defendant ever provided anything of value to either of them.

156.    The two remaining Affiliate Defendants were parties to the Agreement, but Defendant has no genuine claims against them.  Among other things, this Complaint does not seek the return of any sums that these entities, which are not plaintiffs in this action, paid to Defendant, so Defendant does not need, and is not entitled to, the declaratory judgment it sought in Count VIII of its counterclaims.  Also, these two Affiliate Defendants did not withhold payment for part of 2017 as alleged in Count IX.  They therefore cannot be sued for any share of the approximately $1,500 in previously unbilled interest that Count IX seeks.

157.    Defendant's counterclaims, by asserting legally unsustainable claims against multiple entities and individuals who are based in other states, are not subject to personal jurisdiction, and cannot genuinely be held liable, demonstrates Defendant's intention to retaliate against Plaintiff, and to seek, deliberately and with malice, to cause it harm.

158.   If Plaintiff reasserts its baseless counterclaims in response to this Complaint as it did in response to its original complaint, Defendant reserves the right to seek sanctions under Rule 11, Fed. R. Civ. P.

159.   Defendant also demonstrated its intention to retaliate against Plaintiff, and to seek to cause it harm, by including several pages of outrageous allegations in its answer and counterclaims for the sole purpose of attempting to tarnish the reputations of Plaintiff and its personnel.   These allegations do not belong in Defendant's pleading -- they bear no genuine relationship to Plaintiff's claims or to Defendant's (baseless) counterclaims.   Defendant inclusion of these irrelevant allegations was malicious, intended to harass, and blatantly improper.

160.   Defendant owes Plaintiff duties of confidentiality and non-disparagement under Paragraph 5 of the Agreement.   Among other things, Defendant agreed that it would not disclose Plaintiff's confidential or proprietary information and that it would not "make negative statements about or act in any manner that is intended to or does damage to the goodwill, business or personal reputations of the other or any of its affiliates, shareholders, members, officers, directors, managers, employees, consultants and/or agents."

161.   Defendant owes Plaintiff fiduciary duties of care, loyalty and candor for the reasons alleged in this Complaint, including Defendant's provision of Plaintiff's CCOs.

162.   Upon information and belief, Defendant has released false and misleading information about Plaintiff, its affiliates, and/or its present or former employees to the public. Defendant also improperly released information to the public that it obtained in its capacity as the supervisor and employer of Plaintiff's CCOs.

163.   Upon information and belief, Defendant has provided false and misleading information about Plaintiff, its affiliates, and/or its present or former employees to governmental

representatives.  Upon information and belief, Defendant also improperly released information to governmental representatives that it obtained in its capacity as the supervisor and employer of Plaintiff's CCOs.

164.   Upon information and belief, Defendant has provided false and misleading information about Plaintiff, its affiliates, and/or its present or former employees to the public, and to governmental representatives, with malice and with the deliberate intention of harming Plaintiff.

165.   Upon information and belief, Defendant has provided false and misleading information about Plaintiff, its affiliates, and/or its present or former employees to the public, and to governmental representatives, in ways that are not protected by any privilege or immunity from liability.  Among other things, the disparaging allegations in Defendant's counterclaims are not privileged or protected by any doctrine of immunity because they are gratuitous, malicious and irrelevant.

166.   Defendant's malicious and retaliatory misconduct in breach of its contractual, fiduciary and legal duties has caused harm to Plaintiff, including harm to its reputation. Defendant's malicious and retaliatory misconduct has also caused Plaintiff to incur costs and expenses, including expenditures of officers' and employees' time, plus legal fees and costs in connection with communicating with governmental officials.

167.   Upon information and belief, Defendant has provided false and misleading information about Plaintiff, its affiliates, and/or its present or former employees to the public, and to governmental representatives, with conscious indifference to the consequences of its actions such that an award of punitive damages to punish, penalize, or deter Defendant from committing similar actions in the future is justified.  Because Defendant has acted with conscious indifference and specific intent to cause harm, there is no limitation on the amount that may be awarded as

punitive damages. Plaintiff should be awarded punitive damages from Defendant in an amount to be determined at trial but not less than $1,000,000.00.

168.    For the foregoing reasons, Plaintiff is entitled to judgment on Count V of its Complaint in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment granting the following relief against Defendant:

A.    Compensatory damages on all counts in an amount to be proven at trial;

B.    Disgorgement of all sums that Plaintiff paid to Defendant;

C.    Prejudgment interest;

D.    Punitive damages in an amount to be determined at trial;

E.    The costs and expenses incurred in this action, including reasonable fees for attorneys, accountants and experts; and

F.    Such other and further relief as may be just and proper.

## JURY DEMAND

PLAINTIFF DEMANDS A TRIAL BY JURY OF ALL ISSUES THAT CAN BE SO TRIED.

Dated:  September 3, 2019

GRIFFIN HAMERSKY LLP

By: /s/ Scott A. Griffin
Scott A. Griffin
Michael D. Hamersky
Richard K. Milin
420 Lexington Avenue, Suite 400
New York, New York 10170
Telephone: (646) 998-5580
Facsimile:  (646) 998-8284

*Counsel for Plaintiff Triton Pacific Securities, LLC*