

November 20, 2019

**Via ECF**

Hon. Paul A. Engelmayer
U.S. District Court
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square, Room 1035
New York, NY 10007

    Re: *Triton Pacific Securities LLC v. Mission Critical*
       *Services Corp.*, Case No. 1:19-cv-05789 PAE (S.D.N.Y.)

Dear Judge Engelmayer,

On behalf of plaintiff and counterclaim defendant Triton Pacific Securities LLC ("Triton"), I write to move for dismissal of the counterclaim asserted by defendant Mission Critical Services Corp. ("MCS") pursuant to this Court's Order dated September 17, 2019, Docket No. 16 (the "Order"). The Order gave Triton the option to "file a new motion to dismiss" or to "submit a letter to Court, copying MCS, stating that they rely on the previously filed motion to dismiss."

Triton does rely, in substantial part, on its previously filed motion. Triton's motion dated September 3, 2019, Docket No. 9 (the "Motion"), sought only a more definite statement of Counterclaim Count IX, but it did so based on three potentially fatal flaws in the claim.

Counterclaim Count IX has now been amended, and it is currently asserted both as MCS's only counterclaim (the "Counterclaim") and as a "third-party claim" against two additional defendants. However, MCS's amendment made no effort to remedy any of the three flaws that Triton's Motion identified. Further, the Counterclaim repeats MCS's materially false allegation concerning the terms of the parties' contract and adds new false allegations which are essential to the Counterclaim's viability. Above all, Triton has now located the "demand letter" on which MCS's Counterclaim relies. It demonstrates unambiguously that MCS's Counterclaim has no basis in fact.

For these reasons, Triton moves to dismiss MCS's Counterclaim pursuant to Rule 12(b)(6), Fed. R. Civ. P. Triton respectfully submits that, given the Court's Order and the fact that the Counterclaim seeks less than $2,000 in damages, these issues are sufficiently raised by this letter motion. If the Court so directs, Triton can file a separate motion. However, Triton is attempting to keep costs down, in part because it seeks reimbursement under Rule 11, Fed. R.



Civ. P.  Triton's multiple requests that MCS withdraw its Counterclaim for the reasons stated here, or put the Counterclaim on hold in view of the small amount at issue, have proved unsuccessful.  Triton has also refused to delay serving third-party defendants until this motion to dismiss is decided.  Because the schedule for this letter-motion precluded filing a separate motion under Fed. R. Civ. P. 11(c)(2), Triton respectfully seeks sanctions under Rule 11(c)(3).

1. MCS's Counterclaim Should Be Dismissed
   Based on Flaws Identified in Triton's Motion

Triton's Motion sought a more definite statement of MCS's Counterclaim Count IX based on three potentially fatal flaws in the claim as pled.  The Motion argued:

> Counterclaim Count IX seeks approximately $1,500 in interest allegedly due on $19,200 that Triton "withheld" from paying it in November 2017.  This claim is too vague for Triton reasonably to prepare a response because MCS fails to specify when the $19,200 was invoiced or specify, as the parties' Contract expressly requires, that MCS received no written objection to the invoice.  Indeed, MCS's allegation that Triton "withheld" the $19,200 indicates that Triton did object to MCS's invoice, and Count IX is based on sums withheld after MCS was terminated for incompetence.

> Given MCS's lack of specificity, Triton cannot determine whether Count IX should be dismissed based on the plain words of the parties' contract or whether it should be answered.  MCS also fails to allege a required element of the claim: that MCS complied with its own contractual obligations, despite its failure to provide competent compliance services and its recent misconduct after Triton filed its complaint.  *See, e.g.*, *Remis v. Fried*, 31 Misc. 3d 1203 (Sup. Ct. N.Y. County 2011) ("the plaintiff's performance of the contract" is an element of a breach of contract claim under New York law).  MCS therefore should be required to provide a more definite statement.

As this quotation shows, Triton's Motion identified three principal flaws in Counterclaim Count IX: (1) it does not state "when the $19,200," on which Triton allegedly owes interest, "was invoiced"; (2) it does not "specify, as the parties' Contract requires, that MCS received no written objection to the invoice"; and (3) it "fails to allege a required element of the claim:  that MCS complied with its own contractual obligations."  Although these flaws would have justified moving to dismiss under Fed. R. Civ. P. 12(b)(6), Triton only sought a more definite statement because the flaws appeared to be easily remediable. However, MCS's Counterclaim, as amended from Counterclaim Count IX, makes no attempt to remedy these flaws:  it does not allege when MCS's $19,250 was invoiced, that Triton did not object to the invoices, or that MCS satisfied its own contractual obligations.  It reads, in full, as follows:

420 Lexington Avenue, Suite 400, New York, NY 10170
Tel: 646-998-5580 I  Fax: 646-998-8284 I  info@grifflegal.com  I  www.grifflegal.com

2



104.  Section 4(d) of the Contract provides that TPS and its affiliated entities, Triton Pacific Advisors ("TPA") and Triton Pacific Investment Corporation ("TPIC"), *will be responsible to pay interest on any amounts invoiced and not paid within 30 days* at a rate of the lesser of 1.5% per month or the maximum amount allowed by law.

105.  *Between February 2017 and November 2017, TPS withheld amounts due to MCSC for services rendered prior to May 23, 2017* in the aggregate amount of $19,250.

106.  TPS was aware that interest was owed because *the Contract and each invoice sent by MCSC clearly indicate* that amounts due are net 15 days and *that interest commences to accrue thereafter*.

107.  Among its efforts to collect this unpaid debt, on or about November 10, 2017, MCSC sent a demand letter in which it claimed breach of contract and contract damages, *including specifically interest then owed*, and threatened to file a draft summons and complaint attached thereto.

108.  The principal amount owed was *eventually* paid, but not such interest.

109.  MCSC now demands such interest in an amount to be adduced at trial together with payment of all costs of collection including attorney's fees.

(MCS's Answer dated October 29, 2019, Docket No. 21 (emphasis added).)

Given MCS's failure even to attempt to remedy its Counterclaim's flaws, despite its ample opportunity to do so, its Counterclaim should be dismissed.  It is both unreasonably vague and legal deficient, and should be dismissed for failure to plead at least one essential element. *See*, *e.g.*, *Remis v. Fried*, 31 Misc. 3d 1203 (Sup. Ct. N.Y. County 2011) ("the plaintiff's performance of the contract" is an element of a breach of contract claim under New York law).

2.  MCS's Counterclaim Should Be Dismissed with Prejudice Because Its Essential Allegations Are Disproved by the Documents that MCS Itself Relies On

MCS's Counterclaim should also be dismissed, with prejudice, because the contract and demand letter that the Counterclaim relies on disprove the Counterclaim's essential allegations. The Counterclaim alleges that interest was automatically due under the parties' contract, that MCS demanded interest no later than November 2017, and that Triton paid the principal MCS billed it for, but not the interest.  These allegations are demonstrably untrue.

The facts are these:  The parties' contract provided that MCS "reserve[d] the right" to charge interest on "the amount past due," but *not* that interest would be charged automatically, and MCS did not actually assert a right to charge interest until it filed its Counterclaim.  At that point, *no amount* was past due because the invoices at issue had been paid two years earlier.



GRIFFIN HAMERSKY LLP
ATTORNEYS AT LAW

MCS's November 10, 2017 "demand letter" – which MCS admits was paid in the same month in which it was sent – does not, as MCS falsely claims, demand interest under the parties' contract. Further, as shown below, every highlighted word or phrase in the Counterclaim as quoted above is either materially misleading or demonstrably false. Triton respectfully requests that this Court direct MCS to show cause under Rule 11(c)(3), Fed. R. Civ. P., why it should not impose sanctions for the costs of responding to MCS's baseless Counterclaim. As Triton advised MCS repeatedly, this Court is entitled to the truth.

The parties' contract did ***not*** provide, as the Counterclaim alleges, that Triton "will be responsible to pay interest on any amounts invoiced and not paid within 30 days" or, as the Counterclaim also and inconsistently alleges, that "interest commences to accrue" after 15 days. (Counterclaim ¶¶ 104, 106.) Rather, the contract states only that MCS "***reserves the right ... to ... charge interest*** on the amount past due..." (*See* Contract, annexed as Exhibit 1, ¶ 4(d).) Also, MCS's invoices did not become "payable by Client" unless and until no written objection was received within fifteen business days after receipt. (*Id.*)

On or about November 10, 2017, MCS billed Triton for the $19,250 it mentions in Paragraph 105 of its Counterclaim. (*See* Counterclaim ¶¶ 105-07; Letter dated November 10, 2017, annexed as Exhibit 2 (the "Demand Letter").) It is not yet clear whether this sum was genuinely due or deliberately "withheld," or whether Triton notified MCS of objections to any of it. However, though MCS's errors are material only to calculation of the amount at issue, the Counterclaim is incorrect when it alleges that "Between February 2017 and November 2017, TPS withheld amounts due to MCSC for services rendered prior to May 23, 2017 in the aggregate amount of $19,250." (Counterclaim ¶ 105.) The Demand Letter actually asks for $19,250 based on five attached invoices which state that they became due at different times between March 22 and July 21, 2017, and included "compliance services for June 2017," not just "prior to May 23, 2017." (*See* Exh. 2.)

Crucially, MCS never actually asserted its contractually "reserved" right to charge interest on the $19,250 – though MCS falsely alleges that it did. According to MCS's Counterclaim, "on or about November 10, 2017, MCSC sent a demand letter in which it claimed breach of contract and contract damages, ***including specifically interest then owed***, and threatened to file a draft summons and complaint attached thereto." (Counterclaim ¶ 107 (emphasis added).) In fact, as Triton pointed out to MCS's counsel in multiple emails on and after November 5, 2019:

> None of the demand letter, its attached invoices or the draft complaint assert any right to charge interest at the contractual rate. Interest is mentioned only in the "Prayer for Relief" (sic) of MCS's draft complaint, which contains a boilerplate demand for what can only be interpreted as statutory pre-judgment interest. If contractual interest had been sought, it would have been included in one of the complaint's causes of action for breach of contract.

420 Lexington Avenue, Suite 400, New York, NY 10170
Tel: 646-998-5580 I Fax: 646-998-8284 I info@grifflegal.com I www.grifflegal.com

4



MCS does not merely make the false allegation that its Demand Letter sought contractual interest on its $19,250. MCS also makes the false allegation that "***the Contract and each invoice sent by MCSC clearly indicate*** that amounts due are net 15 days and ***that interest commences to accrue thereafter***." (Counterclaim ¶ 106 (emphasis added).)  As discussed above, that is not what the parties' contract says, and it is not what the copies of the invoices attached to the Demand Letter say.  Indeed, if there were any support at all for MCS's allegations, MCS's counsel should have provided it in response to Triton's emails of November 5 and later, most recently November 14.  (*See* Exhibit 3.)  Counsel did not do so.

Given these facts, MCS has no genuine right to the interest it seeks in its Counterclaim. MCS admits that Triton paid MCS's $19,250 demand in the same month that MCS sent it, alleging that payment was "withheld" only through November 2017, despite MCS's misleading further allegation that the $19,250 was "eventually" paid. (Counterclaim ¶¶ 105, 108.) In fact, counsel has been informed that Triton paid the $19,250 within ten days, two years before MCS asserted any right to contractual interest.

Further, the parties' contract precludes MCS from demanding interest now.  The contract states that MCS reserved the right to charge interest only "[I]f payment has not been received as set forth herein" and for "***the amount past due***." (Contract ¶ 4(d) (emphasis added).)  No amount has been past due since November 2017, and MCS has no right to seek interest retroactively.  In addition, MCS's demand letter asks for $19,250 as the "full amount" of Triton's obligation.  By paying as requested, Triton accepted MCS's settlement offer, and any further claim for interest was waived.

For the foregoing reasons, MCS's Counterclaim should be dismissed with prejudice.  It is well established that a claim may be dismissed with prejudice under Fed. R. Civ. P. 12(b)(6) based on documents integral to the complaint even if the documents are not attached.  *See, e.g.*, *Cortec Indus v. Sum Holding, L.P.*, 949 F.2d 42 (2d Cir. 1991) ("Plaintiffs' failure to include matters of which as pleaders they had notice and which were integral to their claim – and that they apparently most wanted to avoid – may not serve as a means of forestalling the district court's decision on the motion...").  In the alternative, if the Court should determine that the documents negating MCS's Counterclaim are not "integral" to that claim, Triton asks that the instant motion be treated as a motion for summary judgment pursuant to Fed. R. Civ. P. 12(d).

There is only one genuine plaintiff in this action – Triton, which trusted MCS to provide compliance services that MCS failed to provide.  MCS's Counterclaim is a baseless and retaliatory act which should be dismissed or withdrawn with prejudice because it is contrary to fact.  Worse, MCS's disregard for the truth, as demonstrated above, is a stern and unfortunate warning of what is to come.  (*See also* Letter dated September 17, 2019, Docket No.15 (pointing out that MCS's Mr. Kane had "misrepresented the grounds on which he based his extension



request" by falsely claiming that he could not "get in touch" with his prior attorney.) MCS should be sanctioned under Rule 11, Fed. R. Civ. P., both to compensate Triton for its unnecessary costs and to deter further misrepresentations to this Court.

Respectfully submitted,

GRIFFIN HAMERSKY LLP

/s/ Richard K. Milin
Scott A. Griffin
Michael D. Hamersky
Richard K. Milin
420 Lexington Avenue, Suite 400
New York, New York 10170
Telephone: (646) 998-5580
Facsimile: (646) 998-8284

*Counsel for Plaintiff Triton Pacific Securities, LLC*

# EXHIBIT 1

## Agreement

This agreement ("Agreement") is made as of December 20 2013, between Triton Pacific Investment Corporation, Inc., Triton Pacific Adviser, LLC, and Triton Pacific Securities, LLC (together, "Client" or "Party"), having offices at 10877 Wilshire Blvd., 12th Floor, Los Angeles, CA 90024, and Mission Critical Services Corp., a New York-based corporation having offices at 641 Lexington Avenue, 15th floor, New York, NY 10022 ("Mission Critical" or "Party"), (collectively, the "Parties").

**1. <u>Services</u>.**  Mission Critical shall provide compliance support and other business consulting services to Client.  Client will make all decisions with respect to the engagement(s) hereunder.

**2. <u>Responsibilities</u>.**

In connection with the performance of the services hereunder, Mission Critical:

a.       Shall report to, work under the direction of and participate in meetings and discussions as required and/or requested by Client upon reasonable notice and during normal and reasonable business hours; and

b.       Shall discuss all issues, recommendations and decisions related to the performance of the services, the status of the services or any major issue affecting the services with Client.

In connection with the performance of the services hereunder, Client:

c.       Shall perform the tasks, furnish acceptable personnel, provide the resources and undertake the responsibilities set forth in this Agreement; and

d.       Shall furnish, upon request by Mission Critical, use of a work area within its office space and provide access to and use of its utilities, telephone and facsimile systems and equipment, computer network, copier machines and supplies, as may be required by Mission Critical to perform its services as contemplated in this Agreement; and

e.       Shall be responsible for establishing and maintaining an adequate and effective internal control system, compliance program, record keeping, management, decision-making and other management and compliance functions.  Mission Critical's work performed under this Agreement does not guarantee that errors or irregularities will not occur and may not detect errors or irregularities should they occur.  Client recognizes that Client shall be fully and solely responsible for applying independent business judgment with respect to the services and work product provided by Mission Critical, to make implementation decisions, if any, and to determine further courses of action with respect to any matters addressed in any advice, recommendations, services, reports or other work product or Deliverables provided by Mission Critical to Client.

**3. <u>Representations and Warranties</u>.**

a. All services provided hereunder by Mission Critical will be provided using the knowledge, skill and judgment in the manner that Mission Critical deems, in its sole discretion, to be the most suitable to perform the work contemplated hereunder; and

b. Notwithstanding anything to the contrary contained in this Agreement, Mission Critical makes no warranties, express or implied, or whether arising by operation of law, course of performance or dealing, custom, usage in the trade or profession or otherwise, including without limitation, implied warranties or merchantability, noninfringement and fitness for a particular purpose; and

c. Client understands and agrees that Mission Critical is not a public accounting firm and does not issue any representations or opinions on financial statements or the financial condition or record keeping procedures or offer any attestation services.  Client further understands and agrees that Mission Critical is not a law firm and is not providing legal advice or opinions.  To the extent required by the CFTC,

FINRA, NASDAQ, NFA, SEC, Treasury and applicable rules (referred collectively as the "Rules"), Client (i) acknowledges to Mission Critical that it is Client's responsibility to design, establish and maintain a system of internal accounting controls and compliance program in compliance with applicable Rules, (ii) acknowledges to Mission Critical that it is Client's responsibility to comply with required applicable Rules.

**4. Invoices and Payment.**

a. Fees. Mission Critical shall charge Client and Client shall pay for the compliance services rendered by Mission Critical based upon the time expended at $250 per hour; and

b. Expenses. If travel is required by Client, all out-of-pocket expenses (including, but not limited to, transportation, tolls, parking, lodging, meals, taxis, phone calls, Internet charges, supplies, etc) incurred by Mission Critical in connection with its performance of the services shall be pre-approved in writing by Client and be billed to Client at the actual amounts incurred. On occasion, travel must be performed during normal working hours, and, in those cases, Mission Critical shall charge its normal hourly rates. Mission Critical shall submit receipts for all expenses invoiced over twenty-five ($25.00) USD dollars. Mission Critical will use its best efforts to follow the travel policies of Client. Client will reimburse Mission Critical for all travel, actual out-of pocket expenses and meal allowance incurred while performing the services described in this Agreement; and

c. Invoices. Mission Critical will invoice Client the last business day of the month for payment of both fees and expenses incurred. Mission Critical will invoice any remaining accrued fees and expenses upon the termination of this Agreement; and

d. Payment. Client will make payment to Mission Critical no later than fifteen (15) business days upon receipt of invoices from Mission Critical by either regular mail, fax transmission, email, internet delivery, or personal delivery. If no written objections are received by Mission Critical within such fifteen (15) business day period, invoices shall be deemed accepted and payable by Client. All payments provided hereunder by Client will be in strict compliance with this Agreement. If payment has not been received as set forth herein, Mission Critical reserves the right, in addition to any other rights it may have to (i) suspend the services until such payment is made in full, (ii) charge interest on the amount past due at the lesser of 1.5% per month or the maximum allowed by law and (iii) invoice Client and Client shall be responsible for payment of all costs of collection including attorney's fees.

**5. General.**

a. Confidentiality. Each Party acknowledges that it or its employees or agents may, in the course of performing its obligations under this Agreement, be exposed to or acquire information regarding this Agreement, the terms of the arrangement reflected herein or other information that is proprietary to or confidential to the other Party, such Party's affiliates or third parties to whom such Party has a duty of confidentiality ("Confidential Information"). Each Party agrees to hold any Confidential Information in strict confidence and not to disclose such information to any person, except as may be necessary in connection with the performance by such Party of its obligations to the other Party hereunder or as may be required by applicable law to provide to a third-party. If required by applicable law to provide such Confidential Information to a third-party, each Party will use best efforts to give prior notice to the other Party. Each Party will advise each of its employees who may be exposed to Confidential Information of their obligation to keep such information confidential.

b. Non-Solicitation. Client recognizes and acknowledges that Mission Critical's employees, agents and affiliates are a valuable asset of Mission Critical's business and during the term of this Agreement and for a period of one (1) year after termination of this Agreement Client on behalf of itself and its affiliates, agents, employees and/or representatives, agrees not to in any way, directly or indirectly, solicit or induce, divert, take away, employ, retain or hire from Mission Critical on behalf of Client or on behalf of any affiliate, agent, employee and/or representative of Client, any of Mission Critical's employees, members, consultants, affiliates, agents or representatives with whom it (or they) may be

introduced or with whom it (or they) otherwise had contact as a result of the services that may be performed hereunder.

c.  <u>Responsibility of Information</u>. Mission Critical shall be entitled to rely on the accuracy of all information provided by, and decisions and approvals of, Client in connection with Mission Critical's work hereunder.  Client hereby releases Mission Critical and its officers, directors and/or all personnel from any liability and costs relating to the services hereunder to the extent such liability and costs are solely attributable to any information provided by Client, its officers, directors, members and/or all personnel that is not complete, accurate or current in all material respects.  All analyses, reports and other documents provided by Mission Critical to Client hereunder shall be collectively referred to herein as the "Deliverables".  All Deliverables shall have been prepared solely for Client's use.  Mission Critical shall have no responsibility or liability for losses, damages, fees or costs incurred as a result of the unauthorized use, circulation, publication, reproduction or use of Deliverables contrary to the provisions of this Agreement.  Deliverables will reflect Mission Critical's observations as of the date work is concluded. Once Mission Critical has provided Client with Deliverables, Mission Critical assumes no obligation or responsibility to update or revise the observations contained in the Deliverables whether as a result of new information, future events or otherwise.  However, should additional documentation or other information become available which impacts upon the observations described in the Deliverables, Mission Critical reserves the right to amend documents accordingly.

d.  <u>Indemnification</u>.  Client understands and agrees that because of the relationship established between the Parties pursuant this Agreement, Mission Critical (including its principals, officers, employees, consultants, independent contractors and agents) may be requested by a federal or state administrative, regulatory and/or judicial agency, or by other third parties, (collectively, the "Agencies"), whether by summons, subpoena or otherwise, to attend or provide testimony in an administrative and/or judicial proceeding, provide written or oral information and documentation to, or otherwise cooperate with such Agencies relative to an examination, inspection, audit, investigation or other administrative, judicial or private legal proceeding (collectively, the "Proceedings") involving the Client.  In such event, the Client hereby agrees to compensate Mission Critical, at the rates set forth in this Agreement, for time spent by Mission Critical, its principals, officers, employees, consultants, independent contractors and agents in relation to such Proceedings.   Client also agrees to reimburse Mission Critical for all costs and expenses incurred by Mission Critical, including, but not limited to, reasonably attorney's fees, as well as costs and expenses incurred by Mission Critical in investigating or preparing for such Proceeding, in giving testimony or in furnishing information and documents.  Client's obligations pursuant to this paragraph shall be applicable regardless of the cause or nature of the Proceeding. This paragraph shall remain enforceable and valid at all times and shall survive termination of this Agreement.

e.  <u>Notice</u>. Notices and other communications from the Parties under this Agreement shall be in writing and delivered by hand, registered mail, or first class prepaid post to the party receiving such communication at the address specified below:

        <u>If to Client</u>:                                 <u>If to Mission Critical</u>:

        _____         Mission Critical Services Corp.

        _____         641 Lexington Avenue, 15th floor

        _____         New York, NY 10022

        Attn: _____         Attn: Darren Kane, Managing Partner

        Email: _____         Email: darren.kane@missioncriticalservices.com

f.  <u>Non-Waiver</u>.  Waiver by any Party of any breach of this Agreement or the failure to exercise any right hereunder will not be deemed to be a waiver of any other breach or right, nor will the failure of any Party to take action by reason of any such breach or to exercise any such action deprive such Party of the right to take action at any time while such breach or condition giving rise to such right continues in effect.

g. <u>Severability</u>.  If any of the covenants, terms, conditions or provisions of this Agreement are held invalid for any reason, such invalidity will not affect the other provisions hereof which are intended to be and will be deemed severable.

h. <u>Successors and Assigns</u>.  This Agreement will be binding upon and inure to the benefit of Mission Critical and Client, its successors and permitted assigns.

i. <u>Entire Agreement and Amendments</u>.  This Agreement sets forth the entire agreement and understanding between the Parties as to the subject matter hereof and merges and supersedes all prior discussions, agreements, understandings, negotiations, correspondences, undertakings and communications (whether written, oral or electronic) of any kind and every nature between them.  This Agreement may not be amended, changed, modified, discharged or abandoned.

j. <u>No Agency Relationship Implied</u>.  Parties will each perform the obligations contemplated hereunder solely as independent contractors, and no joint venture, partnership, employment, agency or any other relationship is intended, accomplished or embodied in this Agreement.

k. <u>Non-Disparagement</u>. During the term of this Agreement and at all times thereafter, neither Parties shall defame, disparage, make negative statements about or act in any manner that is intended to or does damage to the goodwill, business or personal reputations of the other or any of its affiliates, shareholders, members, officers, directors, managers, employees, consultants and/or agents.

l. <u>Disputes</u>. Any controversy between Parties arising out of or relating to this Agreement will be settled by court in the borough of Manhattan, New York City.

m. <u>Governing Law and Interpretation</u>.  This Agreement will be governed in all respects by the laws of the State of New York.  Headings are for reference only and are not intended to affect the meaning of any terms.

n. <u>Termination</u>.  The arrangements in this Agreement will apply from the date above until terminated by either Party on giving the other Party 30 days' prior written notice. In the event of termination by either Party, Client shall pay Mission Critical the fees for all services and expenses incurred by Mission Critical through the date of termination.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.


Mission Critical Services Corp.

By:_____

Name: Darren Kane
Title: Managing Partner
Date: _____


Triton Pacific Investment Corporation, Inc.
Triton Pacific Adviser, LLC,
Triton Pacific Securities, LLC

By:_____

Name: Michael Carroll
Title: Chief Financial Officer
Date: 12-20-2013

# EXHIBIT 2

MISSION *CRITICAL* SERVICES

641 Lexington Ave., 15th Floor
New York, NY 10022
Tel: (212) 734-0322

November 10, 2017

Mr. Michael Carroll
Chief Compliance Officer
Triton Pacific Securities, LLC
32451 Golden Lantern
Suite 304
Laguna Niguel, CA 92677

*Delivered via Certified Mail, Return Receipt Requested*
No. 7015 3010 0000 8564 0350

       Re:     Outstanding Invoices

Dear Mr. Carroll:

       Our records indicate that Triton Pacific Securities, LLC ("Triton") currently has five (5) outstanding invoices in the total amount of $19,250.00. These invoices are for services rendered by Mission Critical Services ("Mission Critical") to Triton during each month from February through June 2017.

       As you may be aware, the terms of our agreement with you indicate that invoices issued by Mission Critical shall be paid within fifteen (15) days upon your receipt thereof. However, despite repeated requests for payment, these invoices remain outstanding. As such, Triton is in breach of our agreement by its failure to pay the outstanding invoices. Accordingly, we are writing to attempt to resolve this matter without the need for litigation by requesting that you make payment within the next ten (10) days. If you fail to make payment within ten days, we will be left with no other recourse but to commence suit without further notice.

       Accordingly, please forward to our office or directly to Mission Critical, on or before November 27, 2017, your good check or wire transfer payable to "Mission Critical Services Corp." for the full amount of this obligation, to wit, $19,250.00. You should note that the Summons and Complaint will be filed and served without further notice in the event no payment is made by the requested date. The Complaint seeks the unpaid balance due, along with the costs of collection and reasonable attorneys' fees pursuant to the terms of your agreement with Mission Critical which will exceed the amount of the invoice as we will be charging you $300 per hour for our collection efforts, so it would be in your financial interest to send payment before November 27, 2017.

       I trust you will make every effort to satisfy this debt promptly in order to avoid unnecessary costs and action as outlined above. **This is an attempt to collect a debt and information received may be used against you.**

                            Sincerely,

                            Darren Kane
                            Managing Partner

Enclosed:
Outstanding invoices
Draft Summons and Complaint

1

# Mission Critical Services Corp.
641 Lexington Avenue, 15th Floor
New York, NY 10022

# Invoice

| Date | Invoice No. |
|------|-------------|
| 3/7/2017 | 6904 |

| Bill To |
|---------|
| Triton Pacific Securities, LLC<br>10877 Wilshire Blvd. 12th Floor<br>Los Angeles, CA 90024<br>c/o: Mr. Michael Carroll |

| Terms | Due Date |
|-------|----------|
| Net 15 | 3/22/2017 |

| Description | Hours | Rate | Amount |
|-------------|-------|------|--------|
| Compliance services for February 2017. | 23.75 | 275.00 | 6,531.25 |

On 1/1/17, our rate increased $25.

| | |
|---|---|
| **Total** | $6,531.25 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $6,531.25 |

| Telephone No. | Web Site |
|---------------|----------|
| (212) 734-0322 | www.missioncriticalservices.com |

# Mission Critical Services Corp.

641 Lexington Avenue, 15th Floor
New York, NY 10022

# Invoice

| Date | Invoice No. |
|---|---|
| 4/10/2017 | 7054 |

**Bill To**

Triton Pacific Securities, LLC
10877 Wilshire Blvd. 12th Floor
Los Angeles. CA 90024
c/o: Mr. Michael Carroll

| Terms | Due Date |
|---|---|
| Net 15 | 4/25/2017 |

| Description | Hours | Rate | Amount |
|---|---|---|---|
| Compliance services for March 2017. | 17 | 275.00 | 4,675.00 |

| | |
|---|---|
| **Total** | $4,675.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $4,675.00 |

| Telephone No. | Web Site |
|---|---|
| (212) 734-0322 | www.missioncriticalservices.com |

# Mission Critical Services Corp.
641 Lexington Avenue, 15th Floor
New York, NY 10022

# Invoice

| Date | Invoice No. |
|------|-------------|
| 5/4/2017 | 7162 |

**Bill To**

Triton Pacific Securities, LLC
10877 Wilshire Blvd. 12th Floor
Los Angeles, CA 90024
c/o: Mr. Michael Carroll

| Terms | Due Date |
|-------|----------|
| Net 15 | 5/19/2017 |

| Description | Hours | Rate | Amount |
|-------------|-------|------|--------|
| Compliance services for April 2017. | 12 | 275.00 | 3,300.00 |

| | |
|---|---|
| **Total** | $3,300.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $3,300.00 |

| Telephone No. | Web Site |
|---------------|----------|
| (212) 734-0322 | www.missioncriticalservices.com |

# Mission Critical Services Corp.

641 Lexington Avenue, 15th Floor
New York, NY 10022

# Invoice

| Date | Invoice No. |
|------|-------------|
| 6/21/2017 | 7329 |

| Bill To |
|---------|
| Triton Pacific Securities, LLC<br>10877 Wilshire Blvd. 12th Floor<br>Los Angeles, CA 90024<br>c/o: Mr. Michael Carroll |

| Terms | Due Date |
|-------|----------|
| Net 15 | 7/6/2017 |

| Description | Hours | Rate | Amount |
|-------------|-------|------|--------|
| Compliance services for May 2017. | 12 | 275.00 | 3,300.00 |

| | |
|---|---|
| **Total** | $3,300.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $3,300.00 |

| Telephone No. | Web Site |
|---------------|----------|
| (212) 734-0322 | www.missioncriticalservices.com |

# Mission Critical Services Corp.
641 Lexington Avenue, 15th Floor
New York, NY 10022

# Invoice

| Date | Invoice No. |
|------|-------------|
| 7/6/2017 | 7450 |

| Bill To |
|---------|
| Triton Pacific Securities, LLC<br>10877 Wilshire Blvd. 12th Floor<br>Los Angeles, CA 90024<br>c/o: Mr. Michael Carroll |

| Terms | Due Date |
|-------|----------|
| Net 15 | 7/21/2017 |

| Description | Hours | Rate | Amount |
|-------------|-------|------|--------|
| Compliance services for June 2017. | 5.25 | 275.00 | 1,443.75 |

| | |
|---|---|
| **Total** | $1,443.75 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $1,443.75 |

| Telephone No. | Web Site |
|---------------|----------|
| (212) 734-0322 | www.missioncriticalservices.com |

CIVIL COURT OF THE CITY OF NEWYORK
COUNTY OF NEW YORK

-------------------------------------------------------------X

MISSION CRITICAL SERVICES CORP.,

Plaintiff,

-against-

TRITON PACIFIC SECURITIES, LLC,

Defendant.

-------------------------------------------------------------X

SUMMONS AND VERIFIED
COMPLAINT

Index No:
Filing Date:

Basis of Venue:
CPLR § 302

Plaintiff's Business Address:
641 Lexington Ave, 15th Floor
New York, NY 10022

TO THE ABOVE NAMED DEFENDANT:

YOU ARE HEREBY SUMMONED and required to appear in the Civil Court of the City of New York, County of New York, at the office of the Clerk of the said Court at 111 Centre Street, in the Country of New York City by serving an answer to the annexed verified complaint. Upon your failure to answer, judgment will be taken against you for the sum of $19,250.00 with interest thereon from March 22, 2017 together with the costs of this action.

Defendant's Address:
32451 Golden Lantern
Suite 304
Laguna Niguel, CA 92677

The law or rules of law provides that: (a) If this summon is served by its delivery to you personally within the City of New York, you must answer within Twenty (20) days after such service, or (b) If this summons is served by delivery to any person other than you personally, or is served outside the City of New York, or by publication or by any other means other than personal delivery to you within the City of New York, you are allowed Thirty (30) days after such proof of service thereof is filed with the Clerk of this Court, within which to appear and answer.

A copy of this summons and complaint shall be deemed an original for purposes of this filing.

Dated: New York, New York
November 27, 2017

_____
David Hartman, Esq.
c/o Mission Critical Services Corp.
641 Lexington Avenue, 15th Floor
New York, New York 10022

(212) 734-0322
Attorney for Plaintiff

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------X

MISSION CRITICAL SERVICES CORP.,
                                   Plaintiff,

**VERIFIED COMPLAINT**

                  -against-

Index No:

Basis of Venue: CPLR §302

TRITON PACIFIC SECURITIES, LLC,

                        Defendant.

-------------------------------------------------------------X

       Plaintiff, through its attorney David Hartman, upon personal knowledge, information and belief, for its verified complaint, respectfully alleges as follows:

**THE PARTIES**

       1. At all the times hereinafter mentioned, Plaintiff, Mission Critical Services Corp. ("Mission Critical") was, and still is, a corporation duly organized under and pursuant to the laws of the State of New York, having its principal office in New York County, State of New York.

       2. Upon information and belief and at all the times hereinafter mentioned, Defendant, Triton Pacific Securities, LLC ("Triton") was and still is, a limited liability company organized under and pursuant to the laws of the State of Delaware, having its principal office in Laguna Niguel, California.

**JURISDICTION AND VENUE**

       3. This Court has jurisdiction over the Defendant pursuant to CPLR §302 because the Defendant entered into an agreement with Plaintiff in the State of New York and tendered payment for services rendered by the Plaintiff in the State of New York.

**BACKGROUND**

3

4.   Triton is a broker-dealer that is a Member of the Financial Industry Regulatory Authority ("FINRA").

5.   On or about November 5, 2015, Plaintiff and the Defendant entered into an agreement (the "Agreement") in the State of New York pursuant to which Plaintiff was engaged to provide certain services. Subsequent to the date of the Agreement, Defendant Triton, through its Managing Member and Chief Compliance Officer and other employees, requested the Plaintiff to provide compliance support to Triton and all other business consulting services (hereinafter the "Compliance Services").

6.   From on or about November 5, 2015 through July 24, 2017 inclusive, Plaintiff completed the Compliance Services in accordance with Defendant's requests and the terms and provisions of the Agreement.

7.   Pursuant to said Agreement, the Defendant agreed to pay Plaintiff for the Compliance Services delivered, completed and received, based upon the time expended, at the rates set forth in the Agreement on an invoiced basis for its fees and expenses.

8.   Thereafter, Plaintiff delivered, and Defendant accepted, all of the aforementioned Compliance Services.  The total fee due to Plaintiff for the Compliance Services totaled $ 121,860.65.  Of this amount, a total of $102,610.65 as paid by Defendant to Plaintiff in the State of New York, leaving a balance of $19,250.00 which remains due and unpaid as of the date hereof.

## FIRST CAUSE OF ACTION

9.   Plaintiff repeats and re-alleges each and every allegation contained in the paragraphs of this Complaint designated "1" through "8", inclusive, with the same force and effect as if herein set forth at length.

10.  Defendant failed to pay a total of $19,250.00, despite demands by Plaintiff, and Defendant continues to fail and refuse to pay said balance.

11.  As a result of the Defendant's breach of the Agreement as aforedescribed, Defendant is indebted to Plaintiff in the amount of $19,250.00, none of which has been paid, although duly demanded.

12.  The Agreement states in pertinent part that it shall be construed and governed under the

4

substantive laws of the State of New York without regard to conflicts of law principles.

## SECOND CAUSE OF ACTION

13.  Plaintiff repeats and re-alleges each and every allegation contained in the paragraphs of this Complaint designated "1" through "12", inclusive, with the same force and effect as if herein set forth at length.

14.  The fair and reasonable value of the Compliance Services, goods and services provided by Plaintiff and accepted by Defendant for which payment has not been received by Plaintiff is the sum of $19,250.00.

15.  Defendant failed and refused to pay said sum of $19,250.00, although duly demanded, and as a result, Plaintiff seeks to receive interests on the sum owed by Defendant to Plaintiff beginning from March 22, 2017.

## THIRD CAUSE OF ACTION

16. Plaintiff repeats and re-alleges each and every allegation contained in the paragraphs of this Complaint designated "1" through "15", inclusive with the same force and effect as if herein set forth at length.

17. The Agreement provides in pertinent part, specifically in paragraph 8(c) thereof, that if payment is not received as set forth in the Agreement, Plaintiff may collect all of its costs of collection, including reasonable attorney fees, from the Defendant.

18. Plaintiff requests the sum of $5,000.00 as costs incurred in the collection of the debt owed by the Defendant to the Plaintiff.

## PRAYER FOR RELIEW

WHEREFORE, Plaintiff demands judgment against the Defendant as follows:

(a) on the first and second causes of action, a money judgment in favor of the Plaintiff in the amount of $19,250.00, plus interest from March 22, 2017; and

(b) on the third cause of action, a money judgment in favor of the Plaintiff in the amount of $5,000.00 as and for its costs of collection; and

5

(c) an order granting such other and further relief as to this Court may seem just and proper, together with the costs and disbursements of this action as allowed by law.

A copy of this summons and complaint shall be deemed an original for purposes of this filing.

Dated:  New York, New York
          November 27, 2017

_____
David Hartman, Esq.
c/o Mission Critical Services Corp.
641 Lexington Avenue, 15th Floor
New York, New York 10022
(212) 734-0322
Attorney for Plaintiff

6

# EXHIBIT 3



Richard Milin <rmilin@grifflegal.com>

## Re:

1 message

**Richard Milin** <rmilin@grifflegal.com>                                          Thu, Nov 14, 2019 at 3:15 PM
To: Liam Obrien <lobrien@mcoblaw.com>
Bcc: Richard Milin <rmilin@grifflegal.com>

Liam:

Good talking to you today.  As discussed, and for your convenience, here is the November 10, 2019 demand letter, which I believe was paid in 10 days, and your client's counterclaim.

As we discussed, and as I will inform the Court, the documents the counterclaim relies on show your client's allegations to be false.  Paragraph 107 says that "on or about November 10, 2017, MCSC sent a demand letter in which it claimed breach of contract and contract damages, ***including specifically interest then owed***..."  (Answer Par. 107 (emphasis added).) That is false, as the attached demand letter shows.

The counterclaim also alleges that "***the Contract and each invoice sent by MCSC clearly indicate*** that amounts due are net 15 days and ***that interest commences to accrue thereafter***."  That too is false -- the contract merely reserves the right to demand interest, and none of the invoices we have seen mention interest.  (*See* the attachments to the demand letter.)  Further, the November 10 demand letter, and the complaint it attaches, only seeks principal ***without*** what could have been eight months of interest.  Just add up the invoices it attaches, or read the text of the letter.

It is also worth noting that (1) the letter, invoices and draft complaint are all addressed solely to TPS, and not to the potential third party defendants; (2) the demand letter offers to settle TPS's entire obligation if the $19,250 is paid, as it was; and (3) the contract only authorizes charging interest, upon MCS's exercise of its contractual right, on "the amount past due." There was no amount past due when interest was sought, for the first time, in your client's counterclaim.

For these reasons, the counterclaim should be withdrawn, and the related third-party claim should not be served.  The Court's timing has not allowed us to file a Rule 11 motion, so we do not expect to do so at this time, though I expect we will ask the Court to consider initiating a Rule 11 motion by order to show cause under Rule 11(c)(3).  If we ultimately do obtain sanctions, whether for your client's serving a baseless claim on innocent third parties or otherwise, at least we gave you fair warning, beginning with my email on November 5, and we have offered you alternatives that would not prejudice any genuine rights your client may have.  As you know, I've tried hard, based solely on the facts undisputed documentary record -- and the amount at issue is, as my emails showed you, less than $2,000!

Best,

Richard


Richard K. Milin (Bio)
Griffin Hamersky LLP
420 Lexington Avenue  |  Suite 400  |  New York, NY 10170
T: 646.998.5580 | F: 646.998.8284 | C: 917.975.1326
Email: rmilin@grifflegal.com
Website: www.grifflegal.com

On Thu, Nov 14, 2019 at 1:43 PM Liam Obrien <lobrien@mcoblaw.com> wrote:

I am in a mediation. I shall call you when I have a break. Liam.

Sent via the Samsung Galaxy S9, an AT&T 5G Evolution capable smartphone

-------- Original message --------
From: Richard Milin <rmilin@grifflegal.com>
Date: 11/14/19 9:49 AM (GMT-08:00)
To: Liam Obrien <lobrien@mcoblaw.com>
Subject: Re:

Call me on my cell, please.

Richard K. Milin (Bio)
Griffin Hamersky LLP
420 Lexington Avenue  |  Suite 400  |  New York, NY 10170
T: 646.998.5580 | F: 646.998.8284 I C: 917.975.1326
Email: rmilin@grifflegal.com
Website: www.grifflegal.com

On Thu, Nov 14, 2019 at 11:39 AM Liam Obrien <lobrien@mcoblaw.com> wrote:

Any word? My client in pressing to proceed with service. Liam.

Sent via the Samsung Galaxy S9, an AT&T 5G Evolution capable smartphone

**3 attachments**



**Griffin v1.png**
6K

**Scan of Demand Letter Invoices Summons and Complaint for Triton - KT - 20171110.pdf**
616K

**Triton Answer to Am Com.pdf**
344K